## LIBBY *v.* CLARK.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

Submitted April 19, 1886.—Decided May 10, 1886.

The provisions in article VII. of the Treaty of June 24, 1862, with the Ottawa Indians of Blanchard's Fork and Roche de Boeuf, 12 Stat. 1237, limiting the power of alienating granted lands, apply to the grants authorized by Article III. of the Treaty to be made to chiefs, councilmen, and headmen of the Tribe; and deeds made in violation of that limitation (as it was incorporated by the Land Office into patents for lands allotted to chiefs, councilmen, or headmen), are void.

This was an action in the nature of ejectment. The case is stated in the opinion of the court.

*Mr. George R. Peck, Mr. A. T. Britton,* and *Mr. A. B. Browne* for plaintiff in error.

*Mr. William H. Clark* defendant in error in person.

Mr. Justice Miller delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Kansas.

It is an action in the nature of ejectment brought by Libby against Clark.

Both parties assert title through William Hurr, who is by birth and descent an Indian of the Ottawa tribe, and was one of the chiefs and headmen of the tribe. On the trial the plaintiff read in evidence a patent from the United States to Hurr for the land in controversy, and offered a deed from said Hurr to J. S. Kallock, which, on objection of the defendant, the court refused to receive, and the exception to this ruling, which was affirmed by the Supreme Court, presents the question of Federal law which gives jurisdiction to this court. The patent to Hurr reads as follows:

" The United States of America to all to whom these presents shall come, Greeting :

" Whereas there has been deposited in the General Land Office a return, dated 17th March, 1864, from the Office of Indian Affairs, containing certain lists showing the selections of allotments made for the use of certain Ottawa Indians under the treaty concluded on the 24th day of June, 1862, between the United States and the Ottawa Indians of Blanchard's Fork and Roche de Boeuf, in the State of Kansas, as ratified on the 28th day of July, 1862, which lists were duly approved by the Secretary of the Interior under date of March 9th, 1864 ; and whereas it appears from one of the lists aforesaid that the east half of the northwest quarter of section seven, in township seventeen, the east half of the west half of section thirty, and the east half of the northwest quarter of section thirty-one, in township sixteen, south of range twenty, east of the 6th principal meridian in Kansas, containing 320 acres, has been designated as the allotment of William Hurr : Now, know ye that the United States of America, in consideration of the premises, and pursuant to the 3d and 7th articles of the treaty aforesaid, have given and granted, and by these presents do give and grant unto the said William Hurr and to his heirs the tract of

land above described: Provided, however, and these presents are upon the express condition, and with the limitation, as required by the treaty aforesaid, that the said William Hurr shall not alienate or encumber the aforesaid tracts of land until he shall become, by the terms of said treaty, a citizen of the United States; and any conveyance or encumbrance of said lands, done or suffered by said William Hurr, made before he shall become a citizen, shall be null and void; to have and to hold the said tracts of land with the appurtenances, unto the said William Hurr, and to his heirs and assigns forever, subject to the limitation and condition aforesaid.

"In testimony whereof I, Andrew Johnson, President of the United States, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

"Given under my hand at the city of Washington, this first day of December, in the year of our Lord one thousand eight hundred and sixty-five, and of the Independence of the United States the ninetieth.

[Seal of the U. S. General Land Office.]

"By the President:              ANDREW JOHNSON,
                        By EDW D. NEILL, *Secretary.*
                        S. GRANGER,
                 *Recorder of the General Land Office.*"

The deed from Hurr to Kallock is dated December 1, 1865, and was unaccompanied by any consent of the Secretary of the Interior, or any evidence that Hurr had become a citizen of the United States, and it was for that reason rejected.

Whether Hurr could make a valid conveyance of the land at the time he made the deed to Kallock depends upon the construction to be given to the treaty mentioned in the patent to Hurr, the third and seventh Articles of which are as follows:

"ARTICLE III. It being the wish of said tribe of Ottawas to remunerate several of the chiefs, councilmen, and headmen of the tribe for their services to them many years without pay, it is hereby stipulated that five sections of land is [are] reserved and set apart for that purpose, to be apportioned among the said chiefs, councilmen, and headmen as the members of the

tribes shall in full council determine; and it shall be the duty of the Secretary of the Interior to issue patents, in fee simple, of said land, when located and apportioned, to said Indians. In addition thereto, said last-named persons, and each and every head of a family in said tribe, shall receive 160 acres of land, which shall include his or her house and all improvements, so far as practicable; and all other members of the tribe shall receive 80 acres of land each, and all the locations for the heads of families, made in accordance with this treaty, shall be made adjoining, and in as regular and compact form as possible, and with due regard to the rights of each individual and of the whole tribe." 12 Stat., 1238.

"ARTICLE VII. There shall be set apart ten acres of land for the benefit of the Ottawa Baptist Church, and said land shall include the church buildings, mission-house, and graveyard, and the title to said property shall be vested in a board of five trustees, to be appointed by said church in accordance with the laws of the State of Kansas.

"And in respect for the memory of Rev. J. Meeker, deceased, who labored with unselfish zeal for nearly twenty years among said Ottawas, greatly to their spiritual and temporal welfare, it is stipulated that 80 acres of good land shall be, and hereby is, given, in fee simple, to each of the two children of said Meeker, viz., Emmeline and Eliza; their lands to be selected and located as the other allotments herein provided are to be selected and located, which lands shall be inalienable the same as the lands allotted to the Ottawas.

"And all the above-mentioned selections of lands shall be made by the agent of the tribe under the direction of the Secretary of the Interior. And plats and records of all the selections and locations shall be made, and, upon their completion and approval, proper patents by the United States shall be issued to each individual member of the tribe and person entitled for the lands selected and allotted to them, in which it shall be stipulated that no Indian, except as herein provided, to whom the same may be issued, shall alienate or encumber the land allotted to him or her in any manner, until they shall, by the terms of this treaty, become a citizen of the United

States; and any conveyance or encumbrance of said lands, done or suffered, except as aforesaid, by any Ottawa Indian, of the lands allotted to him or her, made before they shall become a citizen, shall be null and void.

"And forty acres, including the houses and improvements of the allottee, shall be inalienable during the natural lifetime of the party receiving the title: *Provided*, That such of said Indians as are not under legal disabilities by the local laws may sell to each other such portions of the lands as are subject to sale, with the consent of the Secretary of the Interior, at any time." Ib., 1239–40.

By the first Article of the Treaty, it was declared that this branch of the Ottawa tribe of Indians, and each one of them, should become citizens of the United States, and their tribal relations be dissolved, at the end of five years from the ratification of the treaty, which was July 18, 1862. Hurr, therefore, lacked nearly two years of being a citizen when he attempted to convey to Kallock.

It is to be added that the records of the land office show that the land named in that deed was part of the allotment to Hurr as one of the chiefs and headmen of the tribe, under Article three of the Treaty, and not lands certified to him in common with all others of the tribe under Article seven. The question thus presented is whether Hurr held this land after the patent was delivered to him, subject to the stipulations found in it and prescribed by the seventh Article, namely: "And plats and records of all the selections and locations shall be made, and, upon their completion and approval, proper patents by the United States shall be issued to each individual member of the tribe and person entitled for the lands selected and allotted to them, in which it shall be stipulated that no Indian, except as herein provided, to whom the same may be issued, shall alienate or encumber the land allotted to him or her in any manner, until they shall, by the terms of this treaty, become a citizen of the United States; and any conveyance or encumbrance of said lands, done or suffered, except as aforesaid, by any Ottawa Indian, of the lands allotted to him or her, made before they shall become a citizen, shall be null and void."

The Supreme Court of Kansas held that his title was subject to this provision, and, as Hurr had not become a citizen when the deed to Kallock was made, it was void. Counsel for Libby say this was error, because the special allotments to the chiefs and headmen of the tribe, authorized by the third Article of the Treaty, were not subject to this rule, which applied only to the ordinary Indian who was not supposed to be capable of taking care of himself in such a contract of sale.

In support of this view much stress is laid upon the use of the words "*fee simple*," in describing the estate conferred upon these headmen by the third Article, which is not used in that conferring title on the others in Article seven.

The title conveyed to Hurr by the patent was a *fee simple;* that is, it was all the title or interest in the land. No one shared this title, or had any interest in it, and it descended, or would have descended, to his heirs. The restriction on his right to convey did not deprive the title of the character of a fee simple estate. "An estate in fee simple is where a man has an estate in lands or tenements to him and his heirs forever." 4 Com. Dig., *Estates*, 1. The limitation of the power of sale for five years is not inconsistent with a fee simple estate. Such, also, seems to have been the practice of the government in other treaties referred to by counsel in their brief. 7 Stat. 348 *et seq.*

The embodiment of the stipulation required by the seventh Article of the Treaty in the patent to Hurr, shows the construction of the executive department of the government, that it was applicable to the land granted by the third section, as Hurr's acceptance of it seems to imply his acquiescence in it.

Two decisions of the Supreme Court of Kansas on the same subject give this construction to the treaty. The opinion of that court in the present case, *Libbey* v. *Clark*, 14 Kansas, 435, is an able examination of the question, and we concur in the views there stated.

The judgment of that court is        *Affirmed.*