SLOAN v. UNITED STATES.

(Circuit Court, D. Nebraska. October 31, 1902.)

1. INDIANS—SUITS FOR ALLOTMENTS OF LANDS—SPECIAL JURISDICTION OF CIRCUIT COURT.

Act Aug. 15, 1894 (28 Stat. 305), amended by Act Feb. 6, 1901 (31 Stat. 760), conferring upon the circuit courts "jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty," and further providing that any one in whole or in part of Indian blood, who claimed "to have been unlawfully denied or excluded from any allotment or parcel of land," might bring suit in the proper circuit court for the enforcement of his rights, was intended to vest such courts with full authority to hear and determine every question arising in any suit brought by a claimant to an allotment; and the fact that such questions have been decided by the land department adversely to the claimant neither affects the court's jurisdiction nor concludes it on any matter of law or fact.

2. SAME—CONSTRUCTION OF ACTS AND CONVENTIONS.

In construing treaties or conventions made with the Indians, the terms "half blood" and "mixed blood" are to be given their ordinarily under-

stood meaning, and no distinction can be drawn between those who, derive their Indian blood from the mother and those who derive it from the father.

**8. SAME—LANDS OF OMAHA TRIBE—ACT PROVIDING FOR ALLOTMENTS IN SEVERALTY.**

Act Aug. 7, 1882 (22 Stat. 341), relating to the lands of the Omaha tribe of Indians in Nebraska, and providing that with the consent of the tribe allotments in severalty should be made from certain lands within its reservation, superseded all previous legislation on the subject, and dealt with the tribe as it existed at the date of the act; and the right to allotments thereunder is not confined to such persons as were members of the tribe at the date of the treaty of March 7, 1865, and entitled to allotments under its provisions.

**4. SAME—CONSTRUCTION—PERSONS OF MIXED BLOOD.**

Such act makes no distinction, with respect to the right to an allotment, between Indians of the full blood and those of mixed blood, who were at the time living on the reservation in the tribal relation, but does not confer such right, as one which is legally enforceable; upon persons who were not so living in the tribal relation, merely because they are of mixed blood.

**5. SAME—NONRESIDENTS OF RESERVATION.**

A liberal construction should be given the act, however, to effectuate its purpose, which was to encourage the Indians to break up the tribal relation, and adopt the habits of civilized life; and persons of mixed blood, who, although not living on the reservation, were recognized by the tribe as members thereof, and have been formally declared such by the tribe in council or the equivalent, may properly be given allotments; but on the question whether they have been so recognized the courts will follow the rulings of the land department.

**6. SAME.**

A person of mixed blood, who did not reside upon the reservation at the date of the passage of the act, could not, by coming thereon afterward, although prior to the time when the tribe gave the consent required to render the act effective, become a member of the tribe, and entitled to the benefit of the act, unless his application for membership, was approved, and he was recognized by the tribe as a member.

**7. SAME—PRIOR ALLOTMENT TO HALF-BREEDS—CHILDREN OF ALLOTTEES.**

Half-breed members of the tribe who secured allotments of land in severalty in the Nemaha reservation under the terms of the treaty of 1830 are not entitled to a second allotment under the act of 1882, although at the time of its passage they were residing on the reservation in the tribal relation; but the fact of such prior allotment does not affect the rights of the children of an allottee, which, under the later act, are independent of those of the parents.

**8. SAME—QUANTITY OF LAND.**

The quantity of land to which an allottee is entitled under the act of 1882 and the amendatory act of March 3, 1893 (27 Stat. 630), which is dependent on whether or not he is the head of a family, or his or her age, if single, is to be determined by his status at the time when the allotment is made, and not at the date of the act.

**9. SAME—INHERITANCE FROM ALLOTTEE—DEATH BEFORE ISSUANCE OF PATENT.**

Under section 6 of the act of 1882, providing that the law with respect to descent in force in Nebraska shall apply to the lands allotted after patents therefor have been executed and delivered, an allottee has no title to the land allotted, prior to the issuance of a patent therefor, which will descend to his heirs in case of his death, but the land in that case remains a part of the tribal property.

This case, with 24 others in favor of different plaintiffs, were submitted to the court at the same time, and are all disposed of in the following opinion.

Thomas L. Sloan, Charles E. Clapp, H. C. Brome, and Anderson & Keefe, for plaintiffs.

John L. Webster and W. S. Summers, U. S. Dist. Atty., for defendant.

SHIRAS, District Judge. These several suits, the United States being the defendant therein, are brought under the provisions of the act of congress approved February 6, 1901 (31 Stat. 760), which enacts:

"That all persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of congress, or who claim to be so entitled to land under any allotment act or under any grant made by congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any act of congress, may commence and prosecute or defend any action, suit or proceeding in relation to their right thereto in the proper circuit court of the United States; and said circuit courts are hereby given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty, and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant."

The plaintiffs in the several cases aver, in substance, that they are in part of Indian blood, being members of the Omaha tribe, and are, therefore, entitled to allotments of land in the reservation of that tribe situated in Thurston county, in the state of Nebraska; that their applications for allotments have been unlawfully denied them by the officers and agents of the United States charged with the duty of allotting the lands of that tribe in severalty, and therefore they invoke the jurisdiction conferred upon the court by the act of congress just cited for the ascertainment and enforcement of their rights. On behalf of the government it is contended that the provisions of the act of congress of February 6, 1901, above cited, do not confer upon the courts jurisdiction to review or vacate the decisions rendered by the interior department upon the applications of the several plaintiffs herein, nor to hear and determine whether the plaintiffs are members of the Omaha tribe in such sense that they are entitled to allotments in severalty of portions of the tribal reservation. This construction of the act practically defeats the evident purpose of the enactment, which is to provide a method for enabling parties, whose claims to allotments have been denied by the department, to obtain an adjudication upon their rights in the proper courts. While due weight must be given to the rulings and decisions of the department as affecting the merits of the cases, yet it cannot be held, in view of the express terms of the act of congress, that the rendition of a decision in a given case adverse to the claim of a particular person prevents the proper court from taking jurisdiction over a suit brought by such person to establish the right or claim denied to him by the action of the department. Sloan v. U. S. (C. C.) 95 Fed. 193; Smith v. He-yu-tse-mil-kin (C. C.) 110 Fed. 60. When the case of Sloan v. U. S. was before the court upon demurrer to the bill, it was held, in substance, that the act of 1882 (22 Stat. 341) was intended

to take the place of the previous acts and treaties providing for the allotment in severalty of the lands forming the Omaha reservation, and I see no sufficient reason for departing from that conclusion, and therefore the fundamental question to be solved is as to the persons who, under the terms of that act, are entitled to claim allotments in severalty. Section 5 of the act provides as follows:

"That with the consent of said Indians as aforesaid, the secretary of the interior be and he is hereby authorized, either through the agent of said tribe or such other person as he may designate, to allot the lands lying east of the right of way granted to the Sioux City and Nebraska Railroad Company, under the agreement of April 19th, 1880, approved by the Acting Secretary of the Interior July 27th, 1880, in severalty to the Indians of said tribe in quantity as follows: To each head of a family, one quarter of a section; to each single person over eighteen years of age, one eighth of a section; to each orphan child, under eighteen years of age, one eighth of a section; and to each other person under eighteen years of age, one-sixteenth of a section; which allotments shall be deemed and held to be in lieu of the allotments or assignments, provided for in the fourth article of the treaty with the Omahas, concluded March 6, 1865, and for which, for the most part, certificates in the names of individual Indians to whom tracts have been assigned, have been issued by the commissioner of Indian affairs, as in said article provided: provided, that any Indian to whom a tract of land has been assigned, and certificate issued, or who was entitled to receive the same, under the provisions of said fourth article, and who has made valuable improvements thereon, and any Indian who being entitled to an assignment and certificate under said article, has settled and made valuable improvements upon a tract assigned to any Indian who has never occupied or improved such tract, shall have a preference right to select the tract upon which his improvements are situated, for allotment under the provisions of this section: provided further, that all allotments made under the provisions of this section shall be selected by the Indians, heads of families selecting for their minor children, and the agent shall select for each orphan child; after which the certificates issued by the commissioner of Indian affairs as aforesaid shall be deemed and held to be null and void."

Counsel for the United States earnestly contend that this section must be read in connection with the limitations found in article 4 of the treaty of 1865 (14 Stat. 667), which declares that: "The Omaha Indians being desirous of promoting settled habits of industry and enterprise amongst themselves by abolishing the tenure in common by which they now hold their lands, and by assigning limited quantities thereof in severalty to the members of the tribe, including their half or mixed blood relatives now residing with them, to be cultivated and improved for their own use and benefit, it is hereby agreed and stipulated that the remaining portion of their present reservation shall be set apart for said purpose;" and that, so reading it, allotments under the act of 1882 can be made only to the mixed blood relatives who were on the reservation when the treaty of 1865 was adopted. I can see no good reason for adopting this view of these statutes. The treaty of 1865 made provision for the allotment in severalty to "members of the tribe," it being declared that the half or mixed blood relatives then residing on the reservation should be deemed to be members of the tribe. The treaty does not recognize the mixed bloods as a separate and distinct class, and does not confer any rights upon them by reason of their being mixed bloods, but the declaration of the treaty in substance is that the mixed bloods

residing on the reservation shall be deemed to be members of the Omaha tribe, and as such to be entitled to the right of allotment. The act of 1882 makes provision for the allotment of the lands of the Omaha tribe of Indians, and in determining who are to be included within this designation weight can be given to the fact that in the treaty of 1865 mixed bloods residing on the reservation were declared to be members of the tribe; but it cannot be held that the right of allotment under the terms of the act of 1882 can only be exercised by those who could assert such right under the terms of the treaty of 1865. When, in section 5 of the act of 1882, it is declared that, with the consent of the Indians, the secretary of the interior is authorized "to allot in severalty to the Indians of said tribe in quantity as follows: To each head of a family, one quarter of a section, to each single person over eighteen years of age, one eighth of a section, and to each other person under eighteen years of age one sixteenth of a section,"—it was certainly not intended to limit this right to an allotment to the members of the tribe who were such in 1865. Many of the members of the tribe now upon the reservation have been born since 1865, yet their right to an allotment, if living upon the reservation when the act of 1882 was adopted, is not and cannot be questioned; and by the provisions of the amendment contained in the Indian appropriation act of March 3, 1893 (27 Stat. 630), it is enacted:

"That the act of Congress approved August 7, 1882, * * * be and the same is hereby amended so as to authorize the secretary of the interior, with the consent of the Indians of that tribe, to allot in severalty, through an allotting agent of the interior department, to each Indian woman and child of said tribe born since allotments of lands were made in severalty to the members thereof under the provisions of said act, and now living, one eighth of a section of the residue lands held by that tribe in common, instead of one sixteenth of a section as therein provided."

Taking into consideration the express provisions of the act of 1882 and of the amendatory act of 1893, it is clear that it was not the intent of congress to limit the right to allotments in the Omaha reservation to such persons only as could have asserted the right under the terms of the treaty of 1865. If such had been the legislative intent, apt words of limitation to that end would undoubtedly have been incorporated in these acts; but none of that import are to be found therein.

The act of 1882, in the first section thereof, declares "that with the consent of the Omaha tribe of Indians, expressed in open council, the secretary of the interior be, and hereby is, authorized to cause to be surveyed," etc.; and in section 5 it is declared "that with the consent of said Indians as aforesaid the secretary of the interior be and is hereby authorized * * * to allot the lands," etc. The tribe whose consent was to be obtained was the Omaha tribe as it existed in 1882, and not the tribe of 1865. The allotment in severalty was not to be made to the members of the tribe living in 1865, but to the members living in 1882. The purpose of the government in inducing the Indians to take allotments in severalty was to provide for the breaking up of the tribal relation, and to place the several

members of the tribe in such condition that they would be enabled to gain a support for themselves and their families by the cultivation and use of the allotments. Unquestionably the parties entitled to allotments under the act of 1882 were the members of the tribe as it then existed, and the question to be determined is whether the several claimants who are the plaintiffs in the cases now before the court were in fact members of the tribe when the act of 1882 took effect. Counsel for the government contend that in determining the status of the plaintiffs the rule of the common law must be applied that children of freeborn parents take the legal status of the father; and therefore in these cases children of a white father and Indian mother must be held to be whites, and as such to be disqualified from sharing in the tribal property belonging to the Indians. In the several treaties entered into between the United States and the Omahas frequent reference is made to half bloods and mixed bloods, but in none is there a distinction made between those deriving their Indian blood from the mother and those deriving it from the father. It is not to be supposed that the Indians, when called upon to agree to an allotment of their lands under the provisions of the treaty of 1865 and the act of 1882, had knowledge of the artificial rule of the common law, which, if it was applied in these cases, would require the ruling that a half blood residing with the tribe, the child of a white father and an Indian mother, could not be deemed to be of mixed Indian blood, whereas a child of an Indian father and a white mother would be held to be of Indian blood, and therefore entitled to share in the tribal property. As ordinarily understood by white people, a person of white and Indian parentage is deemed to be a mixed blood, without regard to the source of the Indian blood. In other words, in common parlance the child of a white father and an Indian mother, as well as a child of an Indian father and a white mother, are equally of mixed blood; and therefore, when, in a convention with the Indians, half or mixed bloods are included, no distinction can be drawn between those who derive the Indian blood from the mother and those who derive it from the father. Thus, in Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, it is said by the supreme court:

"In construing any treaty between the United States and an Indian tribe, * * * the treaty must, therefore, be construed not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

As further evidence that it is not the intent of congress, in determining the status of mixed bloods, that the technical rule of the common law should govern, reference may be made to the general Indian appropriation act of June 7, 1897 (30 Stat. 90), wherein it is declared:

"That all children, born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe, shall have the same rights and privileges to the property of the tribe to which the mother belong, or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of congress shall be construed as to debar such child of such right."

As I construe the act of 1882, it was the intent thereof to establish by the terms of that act the rules to be followed in allotting the lands of the Omaha tribe. In the treaty of 1865 provision had been made for allotments in severalty, and for the issuance of certificates by the commissioner of Indian affairs to the allottees; it being provided that to each head of a family there should be assigned not to exceed 160 acres, and to each male person of 18 years or upwards, without a family, a tract not exceeding 40 acres. It does not appear that much progress in making allotments had been made under this treaty, and in 1882 congress again dealt with the situation by the adoption of the act of June 7th of that year. The act provides that, with the consent of the Omaha tribe of Indians, the secretary of the interior is authorized to allot the lands lying east of the right of way granted to the Sioux City & Nebraska Railroad Company "in severalty to the Indians of said tribe in quantity as follows: To each head of a family one quarter of a section; to each single person over eighteen years of age, one eighth of a section; to each orphan child, under eighteen years of age, one eighth of a section; which allotments shall be deemed to be in lieu of the allotments or assignments provided for in the fourth article of the treaty with the Omahas, concluded March 6, 1865"; it being further provided that any Indian who had made improvements upon any tract assigned under the treaty of 1865 should have the preference right to select such tract for allotment under the act of 1882, and that, when the allotments had been made, the certificates issued by the commissioner should be null and void, provision being made for the issuance of patents to the allottees. It thus appears that, based upon the consent of the Omaha tribe, the provisions of the treaty of 1865 with respect to the allotment of the lands in severalty are superseded by the provisions of the new agreement or convention evidenced by the act of 1882, and therefore the rights of the plaintiffs to allotments must be adjudged according to the true intent and meaning of that act, and the right to an allotment of a person coming within the terms of that act cannot be rightfully denied him simply because he could not bring himself within the terms of the treaty of 1865. Under that treaty no woman, unless she was the head of a family, and no child under the age of 18, was entitled to an allotment, whereas under the act of 1882 each single person, regardless of sex, over 18, is entitled to one-eighth of a section, and each orphan child under 18 is entitled to a like amount, and each other person under 18 is entitled to one-sixteenth of a section. These radical changes in the terms of the act of 1882, as well as the provisions therein contained that the certificates issued by the commissioner under the provisions of the treaty of 1865 are to be deemed to be null and void, clearly justify the conclusion that recourse must be had to the act of 1882 in determining who are entitled to allotments in severalty on the reservation belonging to the Omaha Indians, and that limitations found in previous acts or treaties, but not repeated in the latter act, cannot be read into it, in order to defeat the rights of one who fairly comes within the terms of the latest convention between the Indians and the government, as evidenced by the act of 1882. Thus we reach the question of the con-

struction to be given to the terms used in that act, whereby provision is made for the allotment in severalty to the Indians of the tribe of portions of the reservation occupied by them.

Counsel for the government strongly contend that the court is practically bound to follow the rulings and decisions of the department of the interior in these cases, upon two grounds: First, that the construction given by the department charged with the duty of supervising the affairs of the Indians to the statutes and treaties dealing therewith are entitled to great weight, and in doubtful cases should control the judgment of the court; and, second, that the rights of the claimants present cases of mixed questions of law and fact, which prevents the court from considering the same under the recognized rule that courts will not re-examine questions of fact decided by the department in the disposition of the lands placed in its charge, but are limited to a consideration only of questions of law. When congress adopted the act of August 15, 1894, and amended it by the act of February 6, 1901, conferring upon the circuit courts of the United States "jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty," and further provided that any one in whole or in part of Indian blood or descent, who claimed "to have been unlawfully denied or excluded from any allotment or parcel of land," might bring suit in the proper circuit court for the enforcement of his rights, it certainly must have been the legislative intent to confer upon the courts full authority and right to hear and determine every question arising in any suit brought by a claimant to an allotment. These acts were adopted by congress because it was brought to its attention that many persons, claiming allotments, had been denied that right by the department, and it was sought to make provision for a method whereby such persons could reassert their claims before a judicial tribunal. The real purpose of the acts conferring jurisdiction upon the courts in this class of cases would be practically nullified if the contention of counsel should be sustained to the effect that in all cases wherein the department had ruled against the claimant the courts are bound to follow the decision of the department. The remedial intent of the legislation in question must be given fair and full force, and this imposes upon the court the duty of hearing and deciding all questions of law and fact necessary to the full consideration and determination of the rights of the several claimants.

The first question presented for consideration is the construction to be given to the act of 1882 in ascertaining the class of persons entitled to allotments under its provisions. As already stated, I cannot concur in the view that only those entitled to allotments under the provisions of the treaty of 1865 can claim the right under the act of 1882. The latter act was intended to deal with the situation as it existed at the time of its passage. At that time there was in existence the Omaha tribe of Indians, inhabiting their reservation in Thurston county, Neb. The earnest desire of the government was to bring about the abolition of the tribal system and community of

property, and to that end provision was made for the allotment of the tribal lands in severalty among the Indians constituting the tribe. If such a construction should be put upon the act that a portion of the persons of Indian blood residing on the reservation in the tribal relation should be excluded from the right to an allotment, it would follow that these persons would be deprived of the benefit they enjoyed as members of the tribe, without receiving any share in the tribal land,—an unjust result, which certainly cannot be defended upon the words of the act, or upon a fair construction of its real purpose. It certainly was not the purpose of the government, in seeking to bring about the severance of the tribal relation through the allotment of the lands in severalty, to sever such relation in any case without awarding compensation through an allotment in severalty. It was certainly well known to congress, when that act was adopted, that the Omaha tribe was not composed alone of Indians of the full blood, but that there were then upon the reservation, living with the tribe, many half or mixed bloods. The reasons for awarding to these persons lands in severalty in order to sever the tribal relation were just as strong as in case of the full bloods, and there is nothing in the language of the act that necessarily restricts the right to an allotment to the full bloods alone. Indeed, counsel for the government admit that there are mixed bloods who are entitled to an allotment, but their contention is that only those mixed bloods who were on the reservation in 1865 are entitled to allotments. Under the treaty of 1865 the mixed-blood members of the tribe were entitled to allotment, and I can see no sufficient reason for holding that congress intended to exclude such members when enacting the act of 1882. As already said, that act was intended to deal with the situation as it then existed, and to provide for allotment to the members of the tribe who would otherwise be deprived of their existing tribal rights. As I construe the act of 1882, it was not intended to make a distinction, with respect to the right to an allotment, between Indians of the full blood and of mixed blood residing on the reservation in the tribal relation, with one exception, to be hereafter noticed; but I am further of the opinion that this right is not possessed by the mixed bloods who were not living on the reservation as members of the tribe when the act of 1882 was adopted. As was well said by Commissioner Price in a letter of instructions issued under date of October 5, 1883:

"It would be absurd to contend that the treaty of 1865, or the more recent act of congress, under which the allotments are being made, were intended as a general invitation to all persons everywhere, who might be able to prove the existence of a drop or more of Indian blood in their veins, to repair to the reservation and select an allotment. Manifestly, such was not the intention, nor will any such construction be admitted in making the allotments."

It may be that in some exceptional cases persons might be recognized to be members of the tribe, and as such to be entitled to allotments, although not upon the reservation when the act of 1882 took effect; but such recognition should be limited to those persons, if any, whom the tribe clearly deemed to be members. It must be

kept in mind that in the adoption of the act of 1882 the congress was not granting or donating the property of the United States, which would justify the application of a strict rule of construction in favor of the United States. The act of 1882, as well as the treaty of 1865, is a convention between the Omaha tribe and the government, whereby, with a view to encourage the Indians in the habits of civilized life, provision was made for breaking up the tribal relation through the allotment of portions of the reservation in severalty. Therefore it seems to me that the department would be justified in making allotments, not only to the actual resident members of the tribe, but to such others as the tribe, acting in open council, or the equivalent, should declare to be members of the tribe, and entitled to share in the allotment of the tribal land. Such allotments, however, would be matters of favor, depending upon the action of the tribe, and not upon the rights created by the act of 1882; and therefore claimants who cannot bring themselves within the provisions of the act of 1882 by showing that when that act took effect, they were residing on the reservation in the tribal relation, but who claim that, as a matter of fact, they were recognized by the tribe to be members thereof, cannot rightfully expect that the courts will refuse to accept and follow the ruling of the department upon the question of such recognition. The agents charged with the duty of making the allotments, who visit the tribe, have a much better knowledge of the action taken by the tribe than can be gained by the court; and their decision upon a fact of this nature, especially when duly affirmed by the officers of the interior department, should ordinarily be accepted as conclusive. In the numerous reports of the alloting agents introduced in evidence in these cases it is reported that none of the several claimants are recognized by the tribe as members entitled to allotments, and these findings of fact have been approved by the secretary of the interior, and they will, for the reasons stated, be accepted as final by this court in the further consideration of these suits.

It is further contended on behalf of plaintiffs that the act of 1882 did not take effect until the consent of the tribe was obtained thereto, and therefore all mixed bloods who had returned to the reservation at that date are to be deemed to be within its terms, the same as though they were residents on the reservation in 1882. It is shown in the evidence that a special agent to make the allotment was sent to the reservation in the early part of 1883, and the assent of the tribe to the provisions of the act had evidently been had by that time. Even if it should not be properly held that the rights of the parties are to be determined by the actual situation as it existed on the 7th day of August, 1882, being the date of the adoption, by congress, of the act in question, yet it cannot be held that a mixed blood, who was not at that date an actual resident of the reservation, could make himself a member of the tribe in such sense as to entitle him to the rights created by the act of 1882, by simply coming upon the reservation, it not being shown that his action was approved by the tribe acting thereon. If the tribe had recognized and approved the application of a particular Indian, their action would have resulted in

his application being recognized by the alloting agent, but, in the absence of such recognition, it must be held that a mixed blood who was not a resident, in the tribal relation, of the reservation, when the act of 1882 was adopted by congress, could not force the tribe to recognize him as a member entitled to share in the allotment by coming upon the reservation, even though he did so by invitation of his relatives in the tribe.

A further question necessary to be considered is the effect to be given to an allotment made under the terms of the treaty of 1830, whereby what is known as the "Nemaha Reservation" was assigned for the use and occupancy of the half-breeds of the tribe, it being therein provided that "the president of the United States may hereafter assign to any of the said half breeds, to be held by him or them in fee simple, any portion of said tract not exceeding a section of six hundred and forty acres to each individual." It cannot be held that it was the intent and purpose of this section of the cited treaty to confer upon the half-breeds of the tribe a greater interest or right than was possessed by the full bloods; and yet that would be the practical result if it should be ruled that a half-breed, after reaping the benefit of an allotment in the Nemaha reservation, should also be entitled to a further allotment in the present reservation; and, without further elaboration of the reasons for so ruling, I hold that all mixed bloods who have secured allotments in the Nemaha reservation are debarred from an allotment in the Thurston county reservation. Where, however, a mixed blood was living in the tribal relation upon the present reservation when the act of 1882 took effect, his right to an allotment, as a member of the Omaha tribe, would not be defeated because his parents, or either of them, had secured an allotment in the Nemaha reservation. Being of the mixed blood, and being in fact an actual resident in the tribal relation upon the reservation, he must be deemed to be an Indian of the Omaha tribe; and, as he had not received an allotment under the treaty of 1865, his rights under the act of 1882 cannot be defeated because his parents may have reaped the benefit of an allotment. Thus, under the express terms of the act of 1882, the heads of a family are entitled to an allotment, and so, also, are their children. In other words, under the act of 1882 the fact that an allotment under that act has been made to the parent does not defeat the right of the child to a personal allotment. This right of the child is not derived from the allotment right of the parent, nor is it property inherited from the parent, but it is a personal right conferred upon the individual because he is in fact an Indian of the Omaha tribe. If an allotment under the act of 1882 to the parent will not defeat the right of the child to a personal allotment, I can see no good reason for holding that an allotment to the parent under any previous act should be given that effect.

As the act of 1882 and the amendatory act of 1893 give to the heads of families one-quarter of a section, and to all others one-eighth, the question arises whether the quantity to be allotted in a given case is to be determined by the status of the claimant at the date of the act or at the time when the allotment is made. By sec-

tion 5 of the act of 1882 it is provided that the secretary of the interior is authorized to allot the lands in severalty. It is not declared that "there is hereby granted or allotted to each head of a family or other person" so much land, which language, if used, might possibly be construed to be an allotment then taking effect; but the provision is that the secretary of the interior, through agents to be by him selected, is to make an allotment in the future, and the fair construction of this provision is that the status of 'the parties when the allotment is made or claimed determines the quantity to be assigned. This I understand is the rule followed by the agents of the department in making allotments from time to time, and is the rule that will be adopted in dealing with the cases now before the court.

Having thus considered the questions of law pertaining to the cases in general, it will be necessary to determine in each case, from the facts thereof, the rights of the claimant under the construction given to the treaties and acts governing the situation as hereinbefore outlined, each suit being indicated by the name of the plaintiff therein.

Thomas L. Sloan: Claimant is a mixed blood, one-eighth Indian. Is the grandson of Margaret Sloan, the daughter of Michael Barada, a full-blood white man, and Taeglaha Haciendo, a full-blood Indian woman of the Omaha tribe. Margaret married one Thomas Sloan, a white man, in St. Louis; and in 1857, with her husband and children, came to the Nemaha reservation, and was allotted 320 acres therefrom. In 1881 Margaret Sloan, with her grandson, Thomas L. Sloan, came to the present reservation, and they were residents thereof when the act of 1882 was adopted. Thomas L. was educated by the United States government at the school at Hampton, Va., and, while the evidence shows that he is by habit, mode of life, and education a white man, that fact does not deprive him of the right to claim an allotment under the act of 1882, as he was at the date of its adoption living on the reservation, and is in fact of mixed blood. Being a married man, he is entitled to an allotment of 160 acres.

No. 174. John M. Sloan, Artemesia Frost, and Thomas L. Sloan: In this case plaintiffs claim as the heirs at law of Margaret Sloan, averring that during her lifetime, and while residing on the present reservation, she selected the land in the bill described for allotment purposes, and that upon her death, in 1898, the plaintiffs, as her heirs, succeeded to her rights. The evidence shows that Margaret Sloan received an allotment of 320 acres in the Nemaha reservation, which debarred her from claiming a further allotment. Furthermore, Margaret Sloan never obtained a patent or certificate conveying to her a title to a specific piece of land. Even though it might be true that she had, as a member of the Omaha tribe, an interest in the tribal land, that interest did not confer upon her heirs the right to demand the conveyance to them of this specific tract. In section 6 of the act of 1882 it is declared that the law with respect to descent in force in the state of Nebraska shall apply to the lands after patents therefore have been executed and delivered. Until a patent confirming a previous selection has been executed and delivered, the lands included therein would remain part of the tribal property, so far as the right of inheritance is concerned; and, as I view the situa-

tion, Margaret Sloan, at the date of her death, was not vested with the title to the land she was occupying in such sense that her death devolved or vested any title thereto in her heirs, but the land remained part of the tribal property. Under these circumstances plaintiffs have failed to show a right to or title in the land claimed by them, and their bill must be dismissed on the merits, and at their cost.

No. 175. Garry P. Myers: Being of mixed blood, and a resident of the reservation in 1882, Myers is entitled to an allotment, and his right thereto is not seriously questioned by the department, but the debatable point in the case is as to the amount to which he is entitled. It is averred in the answer in this case that Myers claimed to have selected the land for allotment in 1892, he being then a single man, of about 18 years of age, and therefore he is entitled to 80 acres only. The stipulation of facts in the case shows that Myers, by marriage, became the head of a family on March 5, 1893, and that he entered upon the occupancy of the quarter section claimed by him in the spring of 1894. I do not find in the record any evidence to sustain the averrment in the answer that Myers made his selection in 1892, and under the facts stated in the stipulation it must be held that he made his selection in the spring of 1894, at which time he was the head of a family, and entitled to an allotment of 160 acres. The evidence further shows that Myers had occupied and improved the 160 acres by him selected in such sense that under the provisions of section 5 of the act he is entitled to be preferred over any other claimant, and the allotment of 80 acres of the land in question to Taehena Webster was, therefore, an error on part of the agent, Myers being entitled to the whole quarter section. A decree in this case will therefore be entered establishing Myers' right to the 160 acres described in the bill.

In all the other cases submitted to the court, being Nos. 265, 266, 267, 268, 269, 362, 363, 364, 365, 460, 461, 462, 502, 503, 504, 505, 506, 507, 508, 509, 574, and 579, docket T, the several plaintiffs therein have failed to show themselves entitled to the benefit of the allotment provisions of the act of 1882, as construed in the foregoing opinion, and therefore in each case a decree will be entered dismissing the bill on the merits, at the cost of the plaintiff therein.