## UNITED STATES v. TORREY CEDAR CO.

### SAME v. PAINE LUMBER CO.

#### (Circuit Court, E. D. Wisconsin. August 8, 1904.)

**1. INDIANS—RIGHTS OF ALLOTTEES—CUTTING OF TIMBER.**

Under the Stockbridge and Munsee treaty of 1856 (11 Stat. 663), which provided for allotments of land in severalty to Indians on the Menominee reservation in Wisconsin, the title to which should be held by the United States in trust for the respective allottees until patented to them, and the act of 1871 (16 Stat. 404, c. 38), relating to the same lands, an allottee in possession of the land which was duly allotted to him by the council of the tribe in accordance with the provision of the treaty, although no certificate therefor has been issued by the Land Department, has not a mere right of occupancy, but is vested with the equitable title with the same rights and privileges over his estate as if it were a fee simple, and is not liable for waste because of his cutting timber therefrom for sale, in the absence of any statutory inhibition thereof.

**2. SAME—PURCHASER OF TIMBER FROM INDIANS—LIABILITY TO UNITED STATES.**

Conceding that the United States, as trustee for Indian allottees, has authority to protect them from imposition and fraud in respect to their lands, it cannot recover in trover from one who in good faith and for a fair price has purchased timber cut by an allottee from his land, where it has itself no beneficial interest in the land.

At Law. Suits in trover to recover the value of timber cut for sale and sold by the Indian occupant from his alleged allotment in the Stockbridge and Munsie reservation and purchased in good faith by the defendants, respectively. Trial before the court on stipulations waiving a jury.

H. K. Butterfield, U. S. Atty.

Thompsons, Reed & Pinkerton, for defendants.

SEAMAN, Circuit Judge. The primary issue in these suits is whether the Indian allottees under the Stockbridge and Munsee treaty of 1856 (11 Stat. 663), and the act of Congress of 1871 (16 Stat. 404, c. 38), were vested with sufficient title in their allotments to authorize the cutting of timber, for sale and not by way of improvements, without the approval of the Department of the Interior. The selection of the 80-acre tracts by the several members in question under the treaty, and exclusive occupancy, each formally approved by the council of the tribe, are conceded facts; and while the department

has granted no certificate or patent thereupon, and has not formally recognized the validity of the allotments, it has constantly recognized and protected the exclusive possession of each. As the allottees have complied with all the requirements on their part for obtaining the allotment under the treaty, it is not deemed questionable that they are entitled to recognition as allottees, with all the rights intended by the treaty, pending the issue of a patent. The treaty granted the allotments to be located, and the certificate is mere evidence of authorized location, so that operation of the grant is presumptive. Best v. Polk, 18 Wall. 112, 118, 21 L. Ed. 805. The acts of August 15, 1894 (28 Stat. 305; 2 Rev. St. Supp. p. 246), and February 6, 1901 (31 Stat. 760, c. 217), appear to be applicable in such instances to authorize an action establishing their rights under the treaty. Hy-Yu-Tse-Mil-Kin v. Smith, 119 Fed. 114, 55 C. C. A. 216; Sloan v. U. S. (C. C.) 118 Fed. 283.

The contention on behalf of the government is that the case is in any view within the decision in U. S. v. Cook, 19 Wall. 591, 22 L. Ed. 210, wherein "the right of the Indian in the land" was defined as "that of occupancy alone," with the fee in the United States, so that cutting the timber beyond the needs for improving the land "would be waste and unauthorized." On the other hand, the allottees have constantly asserted ownership and right to take the timber without restriction under the treaty. The controversy thereupon is of long standing, and is now presented for judicial determination in various criminal and civil actions. Tested alone by the doctrine upheld in United States v. Cook, supra, the theory of the prosecution is not well founded, as the title there involved is plainly distinguishable from that intended by the Stockbridge and Munsee treaty. That case arose under the Oneida treaty of 1838 (7 Stat. 566), growing out of the prior Menominee treaties, whereby the present Oneida reservation was created, and by its express terms was "reserved to the said Indians to be held as other Indian lands are held"—merely a right of occupancy, as uniformly held in conformity with the early ruling in Johnson v. McIntosh, 8 Wheat. 574, 5 L. Ed. 681. In the case at bar, however, it is manifest that no such limitation was made or intended. The Stockbridge and Munsee treaty of 1856 was entered into to provide for relocation of the remnant of the tribe in Wisconsin, as they were unwilling to remove to a reservation in Minnesota theretofore provided. It recites valuable retrocessions and releases to the United States, and reserves a tract "near the south boundary of the Menominee reservation" of sufficient extent to furnish individual allotments. The terms of the grant were substantially these: After survey into the usual subdivisions, the council of the tribes, under the direction of the superintendent, shall "make a fair and just allotment among the individuals and families of their tribes," in 80-acre tracts to heads of families and other classes named, and 40 acres to others. The allottees "may take immediate possession thereof, and the United States will thenceforth and until the issuing" of patents "hold the same in trust for such persons." Certificates are to be issued "securing to the holders their possession and an ultimate title to the land"; but "such certificates shall not be assignable, and shall contain a clause expressly

prohibiting the sale or transfer by the holder" of such land. After 10 years, upon application of the holder and consent of the council, "and when it shall appear prudent and for his or her welfare, the President of the United States may direct that such restriction on the power of sale shall be withdrawn and a patent issued in the usual form." In the event of the death of an allottee without heirs, before patent, the allotment was not to revert to the United States, but to the tribe for disposition by the council. It is further declared (article 11):

"The object of this instrument being to advance the welfare and improvement of said Indians, it is agreed, if it prove insufficient, from causes that cannot now be foreseen, to effect these ends, then the President of the United States may, by and with the advice and consent of the Senate, adopt such policy in the management of their affairs, as in his judgment may be most beneficial to them; or Congress may, hereafter, make such provisions of law as experience shall prove necessary."

Under the terms of this treaty, the policy of earlier treaties, to reserve to the Indians "to be held as other Indian lands are held"— a mere right of occupancy—was changed to intend an ultimate title in fee simple. Pending the patent, while the legal title is in the United States, the allottee was vested with the equitable title contemplated by the treaty (Crews v. Burcham, 1 Black, 352, 356, 17 L. Ed. 91), unless modified by act of Congress, or by concurrent action of the President and Senate, if therein subject to modification. The provision in restraint of alienation meantime "is not inconsistent with a fee-simple estate." Libby v. Clark, 118 U. S. 250, 255, 6 Sup. Ct. 1045, 30 L. Ed. 133. Assuming, as suggested in the argument (but not so ruling), that the provision for title to go to the tribe in default of heirs would turn it into a base or qualified fee, the allottee living "has the same rights and privileges over his estate as if it were a fee simple" (11 Am. & Eng. Ency. of Law [2d Ed.] 369, and citations), and is not liable for waste (Id. 374). See U. S. v. Reese, 5 Dill. 405, Fed. Cas. No. 16,137.

In 1871, an act of Congress (16 Stat. 404, c. 38) provided for the sale of the lands of this reservation, excepting 18 sections which were reserved for the allottees, and the tracts involved in these suits are within the portion so reserved. This act expressly recognized the rights of allottees under the treaty, declared the "lands assigned and allotted to be held inalienable," and on "reversion to become the common property of the tribe," and that the title be held by the United States, until patent issues, "in trust for the individuals and their heirs to whom the same were allotted." A prior act of 1865 (13 Stat. 562) authorized homestead entries and application for citizenship by members of this tribe, but does not touch the present inquiry, and no other congressional action appears in reference to the reservation or allotments therein.

I am of opinion, therefore, that the title derived under the treaty and confirmed by the act of Congress is sufficient to authorize the cutting of timber for sale, unless restricted by other provisions of law applicable thereto, and that these cases are not within the doctrine of United States v. Cook, supra. See New York Indians v. U. S., 170 U. S. 1, 18 Sup. Ct. 531, 42 L. Ed. 927, and Jones v. Meehan,

175 U. S. 1, 21, 20 Sup. Ct. 1, 44 L. Ed. 49, as to effect of the treaty. In this view, however, another question arises, which impresses me as important and not free from difficulty, namely, whether the treaty right of these Indians is subject to restriction and is restricted by the general policy and legislation in respect of Indians on reservations.

The paternal policy of the government over the Indians has been constantly exercised, and, in so far as it is directed by Congress for their protection and control, the questions arising thereunder "are beyond the sphere of judicial cognizance, and must be met by the political department," even though the terms of a treaty are thereby superseded. Thomas v. Gay, 169 U. S. 264, 271, 18 Sup. Ct. 340, 42 L. Ed. 740; Stephens v. Cherokee Nation, 174 U. S. 445, 483, 19 Sup. Ct. 722, 43 L. Ed. 1041; Lone Wolf v. Hitchcock, 187 U. S. 553, 566, 23 Sup. Ct. 216, 47 L. Ed. 299. In Lone Wolf v. Hitchcock, supra, the authorities are reviewed, and the doctrine stated that Indians who have not "been fully emancipated from the control and protection of the United States are subject, at least so far as tribal lands are concerned, to be controlled by direct legislation of Congress." So it has been held that neither allotment nor citizenship relieves the Indian from restraint against alienation, and his lease or contract to surrender possession to a white man is inoperative (Eells v. Ross, 29 U. S. App. 59, 64 Fed. 417, 12 C. C. A. 205; Beck v. Flournoy Live Stock Co., 27 U. S. App. 618, 65 Fed. 30, 12 C. C. A. 497); also, that the act of 1897 (29 Stat. 506, c. 109), prohibiting sale of liquor to allottees while their land is held in trust by the government, or they are under charge of an agent, is authorized under the constitutional power to regulate commerce with the Indian tribes, and is applicable to a citizen allottee. Farrel v. United States, 110 Fed. 942, 946, 49 C. C. A. 183. Whether the legislative power extends as well to the inhibition or restriction of these allottees in cutting timber upon their allotments under the treaty is an inquiry not involved in these cases, unless such legislation appears. None is cited on the briefs, aside from section 5388, as amended in 1888 (section 5388, 3 U. S. Comp. St. p. 3649), and I am satisfied that the general terms of this provision are not applicable to such allottees without other provisions to make the severance of timber unlawful. In reservations or allotments therein, where the fee is in the United States, and the Indians have right of occupancy only, their cutting of timber for sale is waste and unlawful per se (U. S. v. Cook, supra; Pine River Logging Co. v. U. S., 186 U. S. 279, 284, 22 Sup. Ct. 920, 46 L. Ed. 1164), so that the statute applies; but, as above indicated, the title of these allottees confers fee-simple rights, and is not within such rule. Surely they are not guilty of "unlawfully cutting" their timber, unless prohibited by some other statute. I have examined numerous provisions relating to the reservations and to the executive departments, and found no enactment which seems to authorize such interpretation. In Pine River Logging Co. v. United States, supra, a statute (25 Stat. 673, c. 172) was considered, which provides that the President may authorize "the Indians residing on reservations or allotments, the fee to which remains in the United States," to cut and sell "dead timber standing or fallen" for their sole benefit. Thus authorized, the In-

dians made contracts with the defendants limited "to dead and down timber" of quantities specified, but the limitations were disregarded both by the parties and by agents for the government, and the contractors obtained timber greatly in excess (including green timber), paying, however, the contract prices. They were justly held liable to the government for the excess, as willful trespassers. But neither that case, nor the statute referred to, are applicable to the case at bar. Both are predicated on the fact that the fee was in the United States, with "a right of occupancy" only in the Indians, and the opinion (pages 284, 290, of 186 U. S., page 922 of 22 Sup. Ct. [46 L. Ed. 1164]) rests liability upon such conceded fact.

No statutory inhibition appearing, I am of opinion that the terms of the treaty control the issue; that the cutting of timber was within the rights of the allottees, and that the defendants, purchasing and paying therefor in good faith, without overreaching in any manner, and free from complicity or knowledge of any dispute as to title, are not answerable to the United States for the value. If any regulation of the executive department could have force by way of restriction, under the general authority of Congress, no such regulation is brought to my attention; and, without intimating a ruling as to the power (either delegated or inherent), it may well be remarked that no regulation can be thus operative in any view against these allotments, which is directed and predicated on the theory that the allottees have a right of occupancy alone.

The only precedent cited which impresses me as bearing on this inquiry is an opinion by Attorney General Garland (19 Op. of Attorney General, 232). in reference to the rights of allottees under the act of February 8, 1887 (24 Stat. 388, c. 119), which is not without force as applicable to the allotments in question. The act referred to adopts a policy of allotments with analogous provision as to title—the United States holding "the land thus allotted, for the period of 25 years, in trust for the sole use and benefit of the" allottee and his heirs, and then to be conveyed in fee, unless the President extends the period; and any conveyance or "any contract made touching the same" before the expiration of that time "shall be absolutely null and void." The opinion rules, under the general policy, that the trusteeship therein provided "is substituted for the guardianship heretofore exercised over the tribe," and intends that "no unlawful waste be committed either by the cestui que trust or any one else," so that "the allottee does not possess the right to cut and sell merchantable timber," but is subject to the doctrine of United States v. Cook, supra. An opinion from such source is strongly persuasive, and I have hesitated to depart from its reasoning and conclusion, but find no escape from the conflicting view above stated. Conceding that control and protection of the allottees were contemplated under the treaty, and that, with or without restraint in the cutting of timber, the government, as trustee, could protect them against imposition or fraud, and prevent strangers from entering and cutting timber under purported contracts, it is quite another proposition to sustain a suit on the part of the government to recover the value of timber purchased from the allottee in good faith, for which a fair price was paid. The interest of the government

would authorize recovery only for the benefit of the cestui que trust, and, as the latter has suffered no injury in person or estate through the mere fact of purchase, no rule of law is suggested or known to me which would sanction such recovery under the conceded facts in these cases.

Findings will be prepared and submitted, accordingly, in favor of the defendants.