### DRAPEAU et al. v. UNITED STATES et al.

(Circuit Court, D. South Dakota, S. D. February 28, 1912.)

No. 535.

INDIANS (§ 13*)—LANDS—ALLOTMENT—JURISDICTION—"PERSON OF INDIAN BLOOD."

A white man without any Indian blood, who marries a full-blooded Indian woman according to Indian custom, and who resides with his wife on reservations, is not entitled to the benefit of Act March 2, 1889, c. 405, 25 Stat. 888, authorizing persons in whole or in part of Indian blood, who are entitled to the allotment of land under any law of Congress, to prosecute any suit in relation to their rights thereto.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

In Equity. Suit by Narcissus Drapeau and others against the United States of America and another. Judgment dismissed as to complainant Narcissus Drapeau, and relief granted as to other complainants.

George A. Jeffers and Joe Kirby, for complainants.
Edward E. Wagner, U. S. Dist. Atty., for defendants.

ELLIOTT, District Judge. The above-entitled action has been submitted upon the pleadings and proofs, and after hearing counsel for the respective parties, the court makes and files the following:

### Findings of Fact.

(1) That prior to 1840, Scares at his Shadow, a full-blooded Yankton Indian, and Wistu, a full-blooded Yankton Ai or Crow Creek Indian woman, intermarried upon what was then the Great Sioux Indian reservation, and as the issue of said marriage an Indian girl, who was named Goodline, was born.

(2) That thereafter, when Goodline was about 14 years of age, in

1850 or 1851, Goodline, this Indian girl, whose father was a Yankton and her mother a Crow Creek Indian, married a Frenchman named Goulette, on the Great Sioux reservation near old Ft. Pierre, and was a little later deserted by Goulette, and in 1853 or 1854 the said parents of this Indian girl, Goodline, gave her to Narcissus Drapeau, a Frenchman, one of the complainants herein, and they were married in accordance with the Indian customs at the old stockade west of Ft. Pierre upon the Great Sioux Indian reservation.

(3) That said Narcissus Drapeau is a white man, has no Indian blood, and is one of the complainants herein.

(4) That said Goodline and Narcissus Drapeau continued to live as husband and wife upon the Great Sioux reservation, near where they were married, for six or eight years subsequent to their marriage, when Goodline went down to the Yankton Indian reservation with her brother, and her husband, Narcissus Drapeau, soon after followed her, and they lived with Scares at his Shadow and Wistu, the mother of Goodline, and he worked at the Yankton Indian agency for six months or a year, and then said Narcissus Drapeau and Goodline established a home in Charles Mix county, on the east bank of the Missouri river, at the mouth of Platte creek, and very soon after that time they established a residence on Cedar Island in the Missouri river, on the Great Sioux reservation, built a house there, and maintained a residence at both places, and the complainant Leon Drapeau was born, the issue of this marriage, in the year 1864, at the home on said Cedar Island in the Great Sioux reservation.

(5) That Narcissus Drapeau and Goodline continued to maintain a joint residence on Cedar Island on the Great Sioux reservation and at the mouth of Platte creek on the east side of the Missouri river until about the year 1890, when they moved west of the Missouri river onto the Great Sioux reservation.

(6) The complainant Leon Drapeau above mentioned was born on the Great Sioux reservation, and his home was with his parents, a part of the time on Cedar Island and a part of the time at the home on the east side of the river, and he was married to Emma La Roche in 1884, and there was born to them, the issue of said marriage, Benjamin Drapeau, born in 1888; Rose Drapeau, born in 1890; Ida Drapeau, born in 1897; Louisa Drapeau, born in 1899; Joseph Drapeau, born in 1902; and Eva Drapeau, born in 1905—all of whom were born upon that portion of the Great Sioux reservation now within the boundaries of the Rosebud Sioux Indian reservation.

(7) That Joseph La Roche, a Frenchman, and Hard to Hold, a full-blooded Indian woman, intermarried prior to 1868, east of the Missouri river, and there was born, in 1868, the issue of said marriage, Emma La Roche, whose mother died shortly after her birth, and she was raised by her grandmother, a Cheyenne Indian, on the Great Sioux reservation on what now constitutes the Cheyenne reservation, and her father, said Joseph La Roche, was regularly adopted as a Lower Brule, on the Lower Brule reservation, and was enrolled and allotted on that reservation.

(8) That complainants Leon Drapeau and his wife, Emma La Roche Drapeau were married near the Missouri river in what now

constitutes Brule county; S. D:, and immediately removed to Pocahontas Island in the Great Sioux reservation, where all of the above-named children were born.

(9) That complainant Emma La Roche Drapeau, after she left her grandmother on the Cheyenne River reservation, and before her marriage, lived upon the Brule reservation with her people, all of whom belonged to that tribe.

(10) That continuously since 1883 to 1886 all of the complainants have resided on the Great Sioux reservation in South Dakota, until it was segregated by the Act of Congress of March 2, 1889, into the Rosebud and Lower Brule reservations, and all of said complainants then continued to live on what is now the Rosebud reservation, except such of those as were born upon the reservation during that time, and they have lived all their lives there, except as hereinafter stated.

(11) That for six to ten years, the date is somewhat indefinite, the complainants Leon Drapeau and wife and children then born were duly enrolled by the authorities in charge of the records of the Lower Brule reservation, and their names were continued upon said rolls until some time in 1897.

(12) And thereafter the names of the complainants mentioned in the last paragraph were, without notice to, or consent of, any of said complainants, dropped from said roll of the Lower Brule agency some time after the year 1897, and have not since appeared thereon.

(13) That at all times while said complainants were enrolled·at the Lower Brule reservation they received and shared in the annuities and per capita payments which were made under the provisions of the act of March 2, 1889, 'the same as all other Indians on said reservation.

(14) That while said complainants were so enrolled on the Lower Brule agency they were each allotted Indian land thereon by the special allotting agent of the government for that purpose, but subsequently all of said land was taken from them and allotted to other parties, all of which was done without their consent.

(15) That in 1896 the said complainants who were enrolled at the Lower Brule reservation or agency, together with a large number of other Indians, moved, with their belongings, south of the White river onto the Rosebud reservation, but which the said Indians believed to be their territory, which removal resulted in an act of Congress, and a treaty between the Lower Brules and Rosebuds, bearing dates respectively March 1, 1898, and March 10, 1898, and approved by an act of Congress dated March 3, 1899, at which place on said Rosebud reservation complainants have ever since continued to so reside.

·(16) That at the date said treaty was negotiated between James McLaughlin, in behalf of the government, and the Lower Brule Sioux, which resulted in the act of Congress last above mentioned, one 'of the chief spokesmen of the council held for the purpose of procuring such treaty, in the presence of the other Indians, requested of the said McLaughlin that the names of said complainants be included among those who were in the future to reside on the Rosebud reservation, and at said time said Lower Brules by their chiefs and spokesmen recognized said complainants as members of their band.

(17) That prior to the time complainants were placed upon the rolls, a council was had upon the reservation near where Oacoma now is, and it was the sense of that meeting that complainants should become members of the Lower Brule tribe.

(18) That later, in 1908, a council was held at Rosebud, and those present favored receiving complainants into the Rosebud band.

(19) That the court finds that as a matter of fact, prior to the treaty of 1889, if a member of one tribe wanted to become a member of another, or an Indian wanted to go from one band to another, they made the transfer by simply going there and joining the band. As a matter of fact, they were always accepted. The record also shows that many Yankton Indians associated with the Brules and settled there, have been allotted on the Rosebud, and are known as members of that band, and that it was all done by simply going from the one reservation to the other and affiliating with them. It appears upon the record that Indians desiring to go from one band to another were invariably accepted by the chiefs or subchief, and that this migratory custom continued until the treaty of 1889, when the separate reservations were set apart for the different bands.

(20) Scares at his Shadow was a full-blooded Yankton Indian; Wistu, his wife, a full-blooded Yankton Ai; Goodline, their daughter, was a full-blood, born upon the Great Sioux reservation, her father a Yankton, her mother a Yankton Ai or Crow Creek. Complainant Leon Drapeau, the son of Goodline and a white man, is a half-breed, born upon the Great Sioux reservation, with no education except that which he has received at Indian schools and has always associated and affiliated with the Great Sioux tribe of Indians.

(21) That complainant Emma La Roche Drapeau is a half-blood Sioux Indian, the daughter of a white man and a full-blooded Sioux, who was raised on the Great Sioux reservation at the Cheyenne agency until quite a girl by her grandmother, and thereafter lived with her brothers and other members of her family at Lower Brule, one of the bands of the Great Sioux Nation.

(22) That complainants Benjamin Drapeau, Rose Drapeau, Ida Drapeau, Louisa Drapeau, Joseph Drapeau, and Eva Drapeau are all children of said Leon Drapeau and Emma La Roche Drapeau, and are therefore half-blood Indians, and were all born upon and have always lived upon what is now the Rosebud Indian reservation.

(23) That the complainants, so far as they have received any education at all, have received the same at the Indian schools, and the names of the complainants that were taken to the government school at Chamberlain were by the superintendent of said school forwarded to the Indian agent at Lower Brule and Rosebud from time to time, and no objection was ever made to the education of these children in said schools.

(24) That said complainant Leon Drapeau, and none of his descendants, were ever upon the rolls at the Yankton Indian agency, and none of them participated in or profited by any payments that were made to the Yankton tribe of Indians, or allotments that were given

them under and pursuant to treaties with the government of the United States.

(25) That Scares at his Shadow and Wistu were members of the Medicine Cow band of the Yankton tribe of Indians, after she married him, and from the establishment of said agency, under the treaty of 1868, continued to live upon said agency, affiliate with the Yankton Indians, and drew rations and received allotments as members of that tribe.

(26) That the record does not show, however, that Goodline received any rations later than 1868, and she maintained a home, with her husband, Drapeau, upon Cedar Island, and upon his homestead on the east side of the river, for a number of years, until about the year 1890, when she removed to the Rosebud reservation, where she resided until she died and was buried there in 1904.

(27) That in 1868, after the treaty between the United States and the Great Sioux Nation of Indians was made at Ft. Laramie, Wyo., March 2, 1868, the Indian agency for said Indians was located at the mouth of the Whetstone creek on the west side of the Missouri river within a few miles of the place where said Drapeau squatted at the mouth of said creek, and said agency known and designated as the Whetstone agency remained at said point for about three years, and during its location there the said Goodline and members of her family, including Leon Drapeau, complainant herein, lived near said agency upon the Great Sioux reservation, drew rations there, and returned to their former place of residence at Platte creek on the east side of the river and at Cedar Island and Pocahontas Island on the reservation when the Whetstone agency was moved west in 1872, and they continued to maintain both residences, staying a part of the time at one place and part at the other, until Leon removed permanently to said reservation the year he was married, in 1884, and he has resided there and associated and affiliated with the members of the Great Sioux Nation of Indians at all times since that time.

(28) That said Leon Drapeau made homestead entry on the N. ½ of the N. E. ¼, and the E. ½ of the N. W. ¼ of section 22—98—69, August 11, 1884, and made final proof in support of said entry November 28, 1885, and that a patent issued to him therefor July 14, 1888, and said Leon Drapeau entered, under the pre-emption laws of the United States, the N. W. ¼ of section 26—98—69 and made final proof in support of said entry December 27, 1883, and received his patent therefor April 27, 1888.

(29) That neither of the complainants herein have ever been adopted into the Brule Sioux, commonly known as the Lower Brule Indians, or the Rosebud band of Indians, by three-fourths vote of the adult members thereof, nor with the consent or approval of the United States.

(30) That the United States, through its officers and agents, did not approve either of the adoptions heretofore referred to herein.

(31) That complainant Leon Drapeau and family, complainants herein, were placed upon the roll at Lower Brule agency by Luke Hayes, a subagent in charge of the Lower Brule agency and that they were

by him entered upon the census rolls at said agency, and drew rations and annuities there during the years above stated, and then their names were stricken from said roll by order of the Commissioner of Indian Affairs, and were never thereafter restored.

(32) That in 1895 complainant Leon Drapeau and family and other complainants applied to the Commissioner of Indian Affairs and the Secretary of the Interior for enrollment at the Rosebud agency and membership among the Rosebud Indians, and were denied on the ground that whatever rights they had as Indians would be as members of the Yankton Sioux tribe and they had no rights as members of any of the tribes of the Brule Sioux Nation.

(33) That in 1899 the applications of complainant Leon Drapeau and other complainants herein were denied by the Secretary of the Interior upon the same ground.

(34) That about 1897 the names of said complainants were dropped from the rolls at the Lower Brule agency, and they have never either of them received rations or annuities at said agency except as above stated, and none of the complainants have ever at any time been enrolled at the Rosebud Indian agency or drew or received rations or annuities at said Rosebud agency or elsewhere, as members of the Rosebud band of Indians.

(35) That the complainants have repeatedly sought from the proper government Indian agents, officers of the Indian Department, and allotting agents of the United States, at the Rosebud reservation, enrollment and allotments of Indian land, under the acts of Congress, to which they claim they are entitled, and have at all times been refused.

(36) That the lands described in the complaint, and which complainants in this action seek to have allotted to them, is the land which they selected and which was denied them by the officers of the government.

(37) That complainants have been denied enrollment as members of this tribe of Indians, and denied allotments by the officers of the Indian Department of the United States, for the reason that they were not Lower Brule or Rosebud Indians, and for the reason that Scares at his Shadow and Wistu, the grandmother of the complainant Leon Drapeau, affiliated with and were enrolled as Yankton Indians after the establishment of the Yankton Indian reservation, under the treaty of 1868.

(38) That there is, and always has been, a custom, amounting to a law, in force among the different bands or tribes of the Sioux Nation of Indians, to the effect that a white man marrying an Indian woman, a member of said tribe, the Indian woman becomes and remains the head of the family and is the source from which all annuities, per capita payments, and rations are derived for herself and family. That by this law and custom the right to tribal property is determined by the nationality or race of the Indian mother; the children of the marriage of a white man with an Indian woman take the race or nationality of the mother so far as the right to tribal property is concerned.

(39) I further find that the children of a white father and a mother of Indian blood take the race or nationality of the mother, and the

common-law rule that children take the race or nationality of the father does not obtain among the Indians as to the offspring of a marriage between a white man and an Indian woman.

(40) That the fact that an Indian child is born outside a reservation does not of itself affect the right of the child to tribal property according to the laws and customs of the Sioux Nation.

This action is brought under the provisions of the Act of February 6, 1901, c. 217, 31 Stat. 760, for the purpose of having a determination of the rights of the complainants to be enrolled at the Rosebud Indian agency and to have and receive as their Indian allotments the lands mentioned and selected by or for them as described in the bill of complaint filed herein; the rights of the complainants being dependent upon the foregoing findings of fact and the provisions of the Acts of March 2, 1889, c. 405, 25 Stat. 888; March 3, 1899, c. 450, 30 Stat. 1362–1365; and March 1, 1907, c. 2285, 34 Stat. 1048.

The first statute above referred to provides, at section 1:

"That all persons who are in whole or in part of Indian blood, or descent, who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment act, or any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land, to which they claim to be lawfully entitled by virtue of any act of Congress, may commence and prosecute or defend, any action, suit or proceeding in relation to their rights thereto, in the proper Circuit Court of the United States; and said Circuit Courts are hereby given jurisdiction to try and determine any action, suit or proceeding arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty; and the judgment or decree of any such Court in favor of any claimant to an allotment of land shall have the same effect when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him."

The first proposition involved within the issues presented in this case, as in the case of Mary Sully et al. against the United States et al., 195 Fed. 113, opinion in which has been this day filed, is: Are all of the above-named complainants persons who are in whole or in part of Indian blood or descent?

The complainant Narcissus Drapeau, as appears from the foregoing findings of fact, is a white man, with no Indian blood, and he is therefore not entitled to the benefit of the above and foregoing statute.

This court will therefore refuse to assume jurisdiction of the issues in this case so far as the claims of said claimant Narcissus Drapeau are presented.

An opinion has been this day filed in the case of Mary Sully et al., complainants, against the United States et al., involving the identical issues presented by the bill of complaint in this action, and the questions presented are so similar, and the two cases having been consolidated and submitted together, the court does not deem it necessary to go over the ground covered by that opinion. It is sufficient to say that the above and foregoing findings of fact are practically identical with those in the case referred to, in that Mary Sully, complainant in that case, and Leon Drapeau, complainant in this case, are half brother and sister, being born of the same mother. The status of the chil-

dren of Leon Drapeau and wife is fortified by the blood of the complainant Emma La Roche Drapeau, their mother, and the wife of Leon Drapeau, it appearing that she was born of a full-blood Indian mother; that her mother died when she was a babe; that she was raised until she was a large girl by her grandmother upon the Great Sioux reservation upon what is now known as the Cheyenne reservation; that she then came down the Missouri river and lived upon the said Great Sioux reservation at what is now known and was then known as the Lower Brule reservation, among her other relatives; and that she and complainant Leon Drapeau, upon their marriage, elected to live upon the Great Sioux reservation, to associate and affiliate with the Lower Brule Indians, and afterwards removed, with others of that tribe, south of the White river, upon what is now the Rosebud Indian reservation, and, for the reasons stated in that opinion, were and are entitled to enrollment and allotment.

Wherefore I am of the opinion that the complainant Narcissus Drapeau, a white man, is not entitled to the benefit of the statute giving this court jurisdiction, and as to him judgment should be entered dismissing the bill of complaint with costs.

That as to the other complainants they are, and each of them is, entitled to judgment for the relief demanded in their bill of complaint; that they are entitled to enrollment in the Rosebud Sioux band of Indians; that they are entitled to an allotment of land, pursuant to the provisions of the said treaties with said Indians, and the acts of Congress.

Let judgment be entered accordingly, specifying the amount selected by said complainants, the amount to which each is entitled under the provisions of the statutes of the United States, and the descriptions of land each has selected.