### WALDRON v. UNITED STATES et al.

(Circuit Court, D. South Dakota. July 1, 1905.)

No. 43.

1. PUBLIC LANDS—PRIVATE CLAIMANTS—PRIORITY OF RIGHT.

As between two claimants to public land it is the settled rule of law that the first in time is the first in right.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 55.]

2. INDIANS—ACT DIVIDING GREAT SIOUX RESERVATION—CONSTRUCTION.

Act March 2, 1889, c. 405, 25 Stat. 892, providing for the cession of part of the Great Sioux Indian reservation in Dakota, which by its terms was required to be accepted and signed by at least three-fourths of the adult male Indians occupying or interested in the same, is not to be construed as an ordinary statute, but was in effect a treaty with the Sioux Nation and is to be construed with reference to the understanding the Indians had of it at the time they accepted its provisions. Whether or not a person is an Indian, within its meaning, and entitled to the benefit of its provisions, is to be determined, not by the common law, but by the laws or usages of the tribe, by which the children of a marriage between a white man and an Indian woman take the status of their mother with respect to tribal rights and property, and, there having been a large number of such mixed bloods who were recognized members of the tribes and who signed the treaty, neither they nor other members of their class can be excluded from its benefits.

3. SAME—ACTION TO RECOVER ALLOTMENT.

In an action brought under Act Feb. 6, 1901, c. 217, 31 Stat. 760, which gives to a person in whole or in part of Indian blood or descent the right to bring such action to establish the right to an allotment of land by virtue of an act of Congress, which he claims to have been unlawfully denied him, the decision of the Land Department, upon the question whether or not the plaintiff when a person of mixed blood was recognized as a member of the tribe entitled to the benefit of the act,

will not in all cases be followed, since in case of an adverse ruling such rule would leave the plaintiff without the remedy which it was the purpose of the statute to give him.

**4. SAME—RIGHT TO ALLOTMENT—MEMBERSHIP OF TRIBE.**

Complainant was a woman of five-sixteenths Sioux Indian blood on her mother's side and had been recognized as a member of a Sioux tribe since her birth. On February 10, 1890, at the time of the taking effect of Act March 2, 1889, c. 405, 25 Stat. 892, by which a portion of the Great Sioux reservation was ceded to the government, she was residing with her husband and children on lands on the ceded part of such reservation. Within a year thereafter she filed her election to take an allotment of such lands as permitted by section 13 of the act, but her claim was rejected by the Land Department, on the ground that she was not an Indian, within the meaning of the act, and a trust patent to the land was issued to another member of the tribe who had later settled thereon. Complainant and her children were enrolled on the census, annuity, per capita, and issue rolls of her tribe, and had received rations, annuities, and per capita payments, the same as all other Indians thereof, and two of her brothers signed the acceptance of the act as members of such tribe. *Held,* that she was an Indian, within the meaning of the act, and the head of a family, according to the laws and usages of her tribe, her husband being a white man, and as such was entitled to the allotment and to a cancellation of the patent therefor issued to defendant.

Charles E. De Land (Bartlett Tripp, of counsel), for complainant.
J. D. Elliott, U. S. Atty., and W. G. Porter, Asst. U. S. Atty., for defendants.

CARLAND, District Judge. The above action has been submitted on pleadings and proofs. From the pleadings and proofs the court finds the following facts:

(1) The complainant, Jane E. Waldron, in February, 1889, by the selection of a building site located and, in July of the same year, went upon the land in controversy to reside; said land being described as follows: The S. W. ¼ of section 28; the N. W. ¼ of S. E. ¼ fractional of section 28; the N. E. ¼ of S. E. ¼ fractional, section 28; the S. W. ¼ of N. E. ¼ fractional, section 28; the S. ½ of N. W. ¼, section 28; the N. E. ¼ of S. E. ¼, section 29; and S. E. ¼ of N. E. ¼, section 29—all in township 5 N., Range 31, B. H. meridian, South Dakota.

(2) The complainant established her residence upon said land in the month of July, 1889, and has ever since resided thereon with her family, consisting of herself and her husband and children. At the time of the establishment of said residence by complainant said land was a part, and within the limits of, the Sioux Indian reservation in the then territory of Dakota, now South Dakota. That complainant established her residence upon said land with the purpose and intention in good faith of claiming said land as an allotment, under the provisions of Act Cong. March 2, 1889, c. 405, 25 Stat. 888, was residing thereon February 10, 1890, and had resided upon said Sioux Indian Reservation since the year 1882. Said land is not included within the limits of either of the separate reservations established by said act of Congress.

(3) On February 10, 1890, complainant was entitled to receive, and was receiving, rations and annuities at Cheyenne River agency, S. D., and within one year after said 10th day of February, 1890, to wit, on or about the 5th day of September, 1890, said complainant filed for record with the United States Indian agent at the Cheyenne River agency her election to have the allotment of land to which she would otherwise be entitled on one of the separate reservations created by said act of Congress of March 2, 1889, upon the land hereinbefore in these findings described, and upon which complainant resided February 10, 1890.

(4) Complainant and her children were enrolled on the census annuity per capita, and issue rolls of the Cheyenne Indian agency, and still are so enrolled as Indians belonging to said agency, and said complainant has received, since 1883, and her children, from time to time as they were born, rations, annuities, and per capita payments in the same manner as all other Indians entitled to receive rations, annuities and per capita payments at said agency.

(5) Mary Van Meter, the mother of the complainant, resided upon said Sioux Indian reservation from 1882 till her death, in July, 1894. Her sons John Van Meter, and Charles Luther Van Meter, her daughters Viola Bentley and her children, Elvira Oaks and her children, and said Mary Van Meter herself, were and are, except those who are deceased, carried upon the census, annuity, and per capita rolls of the Cheyenne Indian agency as Indians, and have received and are receiving rations, annuities and per capita payments, the same as all other Indians under similar conditions. Plaintiff's mother's maiden name was Mary Aungie. She was of five-eights Indian blood. She was born at old Ft. George in the Sioux Indian country. Her Indian name was "Cici." Her father's name was Henry Aungie. Her mother's name was Mary Aungie. Complainant's grandmother on the maternal side was one-half Indian blood. When Arthur C. Van Meter married Mary Aungie she (Mary Aungie) was a member of Crazy Bull's band of Yankton Sioux and lived at Sioux Point, near where the Sioux river empties into the Missouri river. Complainant's grandfather Aungie had three-fourths Indian blood. Complainant is five-sixteenths Sioux Indian. Her father was Arthur C. Van Meter, a white man. Complainant was born in 1861 at or near Vermilion. Complainant's grandfather Aungie's mother was a full blood Sioux Indian woman. Complainant's Indian name is "Sutasni." Complainant's mother's family first came to Sioux Point in 1855. Mary Aungie, mother of complainant, drew rations at the Yankton agency when it was established in 1859.

(6) Complainant is, and was on February 10, 1890, an Indian, within the meaning of that word as used in section 13 of the act of Congress of March 2, 1889, and was on the date first mentioned a member of the Two Kettle Band of the Cheyenne Sioux, and as such Indian was the head of a family, consisting of herself, her husband, and children. There is, and always has been, a uniform custom and law in force among the different bands or tribes of the Sioux Nation of Indians to the effect that where a white man marries

an Indian woman, a member of said tribe, the Indian woman becomes and remains the head of the family and is the source from which all annuities, per capita payments, and rations are derived for herself and family. That by this law and custom the right to tribal property is determined by the nationality or race of the Indian mother; the children of the marriage of a white man with an Indian woman taking the race or nationality of the mother, so far as the right to tribal property is concerned. That what is claimed to be the common-law rule, that the children take the race or nationality of the father, does not obtain among the Indians as to the offspring of a white man married to an Indian woman. This custom and law among Indians has been uniformly recognized by the different bands of the Sioux Indians and by the United States. That complainant joined the Two Kettle Band of Sioux Indians at the Cheyenne River agency, was recognized by said band and by the United States as a member thereof. Mary Van Meter, the mother of complainant, drew rations at the Yankton agency after its establishment in 1859. When she died in 1894 she was living upon land allotted to her on the Sioux Indian reservation in South Dakota, under the provisions of the act of Congress of March 2, 1889, and was recognized by the Two Kettle Band as an Indian of said tribe. Complainant is of part Indian blood and of Indian descent. Crazy Bull's mother and the mother of complainant were cousins. Crazy Bull was a chief of the Yanktonais and signed the treaty between the United States and the Yankton tribe of the Sioux Indians in 1858, at which time complainant's mother was a member of said tribe.

(7) That whatever settlement was made by the defendant Black Tomahawk upon the land in controversy was subsequent to that of the complainant, and not in good faith, but in the interest of others.

(8) Black Tomahawk was not residing upon the land in question on February 10, 1890. He was on that date a full blood Sioux Indian and was residing on other land at the date specified. He was receiving, and entitled to receive, rations and annuities at the Cheyenne River Indian agency.

(9) The United States on March 28, 1899, issued and delivered to defendant Black Tomahawk a trust patent for the land in question, under the provisions of section 11 of the act of Congress of March 2, 1889, in pursuance of an allotment of said land to said Indian purporting to have been made under the provisions of section 13 of said act on December 8, 1898, and approved by the Secretary of the Interior December 10, 1898. The United States has hitherto refused to allot said land to complainant and has authorized and requested said defendant Ira A. Hatch to remove said complainant therefrom by force.

(9½) That the fact that an Indian child was born outside an Indian reservation does not affect the right of the child to tribal property according to the laws and customs of the Sioux Nation.

(10) All the material allegations of complainant's bill are true.

The facts being found to be as above stated, it remains to be ascertained whether, as matter of law, complainant is entitled to

the relief prayed for. This action is brought under the provisions of Act. Feb. 6, 1901, c. 217, 31 Stat. 760. That law provides as follows:

"That all persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any allotment act or under any grant made by Congress or who claim to have been unlawfully denied or excluded from any allotment on any parcel of land to which they claim to be lawfully entitled by virtue of any act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper Circuit Court of the United States and said Circuit Courts are hereby given jurisdiction to try and determine any action, suit or proceeding arising within their respective jurisdiction involving the right of any person in whole or in part of Indian blood or descent to any allotment of land under any law or treaty."

It was held in Hy-yu-tse-mil-kin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039, that this act embraces a suit where the facts are as found in this case. Justice Peckham, at page 408 of 194 U. S., and page 678, of 24 Sup. Ct. (48 L. Ed. 1039), in delivering the opinion of the court, uses this language:

"That this act embraces the case of a person situated as was the appellee at the commencement of the suit seems to us so plain as to require no further argument. It is not in any way a retrospective operation which is thus given to the act, except as it applies, by its language, to any one who was then (at the time of the passage of the act of 1894) entitled to an allotment. She claims that she was so entitled to an allotment of the land in question, and that it had been improperly allotted to defendant (appellant) and that the act permits her to assert her claim in the Circuit Court as against the appellant and to have it adjudged between them. We have no doubt she has that right."

Section 13 of Act Cong. March 2, 1889, c. 405, 25 Stat. 892, provides:

"That any Indian receiving and entitled to rations and annuities at either of the agencies mentioned in this act at the time the same shall take effect, but residing upon any portion of said Great Reservation not included in either of the separate reservations herein established may, at his option, within one year from the time when this act shall take effect, * * * by recording his election with the proper agent at the agency at which he belongs, have the allotment to which he would otherwise be entitled on one of said separate reservations upon the land where such Indian may reside."

Section 8 of the act gives 320 acres of land to each head of a family. Section 11 provides for the issuance of patents for allotted lands. Section 16 provides that the acceptance of the provisions of said act by the Indians referred to therein should be in manner and form as required by the treaty concluded between the different bands of the Sioux Nation of Indians and the United States, April 29, 1868, 15 Stat. 639. Article 12 of said treaty provides:

"No treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three-fourths of all the adult male Indians occupying or interested in the same."

Through commissioners appointed by the United States the provisions of the act of March 2, 1889, were accepted by the Sioux Nations of Indians, and the President of the United States by proc-

143 F.—27

lamation fixed February 10, 1890, as the date on which said act should take effect. As between two claimants of public land, it has long been an established rule of law that the first in time is the first in right. Shepley v. Cowen, 91 U. S. 330, 23 L. Ed. 424; Wirth v. Branson, 98 U. S. 118, 25 L. Ed. 86; McCreery v. Haskell, 119 U. S. 327, 7 Sup. Ct. 176, 30 L. Ed. 408; Hy-yu-tse-kin v. Smith, 194 U. S. 414, 24 Sup. Ct. 676, 48 L. Ed. 1039. The same rule must obtain in this case. It is not disputed but that complainant established her residence upon the land prior to the defendant, and, if it is, the evidence clearly shows that such is the fact. From the decisions of the General Land Office it appears that the right of complainant to have the land allotted to her was denied solely for the reason that complainant was not an Indian, within the meaning of that term as used in section 13 of the act of Congress of March 2, 1889. As the court finds in this case that complainant is an Indian, within the meaning of said act, it is proper that the law affecting this question be referred to in connection with the facts in the case. In the first place, it is necessary to keep in mind that the act of Congress of March 2, 1889, does not stand, for the purposes of construction and interpretation, as ordinary laws of Congress, so far as the Indians are concerned, for while it appears in form as an independent legislative act of the government, it was and is a treaty or contract made by the United States and the Sioux Nation of Indians. The act was to have no force or effect unless the provisions thereof were accepted by the Sioux Nations of Indians in the manner provided by Article 12, of the treaty of 1868. The Indians were an ignorant and uncivilized race. They knew little or nothing of the terms of the law which they were to accept except what they were told by the commissioners who negotiated its acceptance. A man who can read cannot be heard to say that he understood a contract to mean something different than its terms imply; but a man who cannot read, and signs a contract on the faith of what the other party to the contract tells him, stands in a very different position. The commissioners of the United States stated to the Indians before obtaining their signatures that the law included mixed bloods as well as full bloods. It must be presumed that Congress knew when the law was submitted for acceptance that there were numerous mixed bloods living upon the reservation about to be divided and drawing rations at the different agencies, and it cannot be presumed that these mixed bloods were intended to be deprived of their rights to tribal property by a law that, without their signature, would not have become effective for any purpose. These observations are made for the purpose of showing that the law must be looked at as a contract and construed with reference to the understanding the Indians had of the law at the time they accepted its provisions. Mixed bloods were accepted as going to make up the number of Indians necessary to accept the law, and John Van Meter and Charles L. Van Meter, brothers of complainant, signed the acceptance as members of the Two Kettle Band at the Cheyenne agency, and they are referred to in the preamble and attestation clauses of said acceptance

as Indians. Senate Executive Document 51 Congress, p. 234, No. 51. When this very case was before the Secretary of the Interior the advice of the then Attorney General of the United States, Mr. Olney, was asked as to the status of complainant as an Indian. Under date of February 9, 1894, in a letter addressed to the Secretary of the Interior, Mr. Olney used the following language:

"It will be noticed that the act under consideration was dependent for its validity upon the consent of the Indians (section 28). In other words, it was substantially a treaty with the Sioux Nation; acts in this form having taken the place of the ancient Indian treaty since the latter was prohibited by act of Congress in 1871. By the agreement confirmed in this act the Sioux Nation gave up a large amount of territory, and the rights conferred on the nation or on individuals were in consideration thereof. The persons entitled to such rights, are the persons who, at the time of the agreement, constituted the Sioux Nation and were lawful members thereof. The question therefore whether any particular person is or is not an Indian, within the meaning of this agreement, is to be determined in my opinion, not by the common law, but by the laws or usages of the tribe. See Western Cherokee Indians v. United States, 27 Ct. Cl. 1–54; United States v. Old Settlers, 148 U. S. 427–429, 13 Sup. Ct. 650, 37 L. Ed. 509. As to these laws or usages I am not informed and am not qualified to advise." Senate Ex. Doc. No. 59, p. 109, 53 Cong.

This statement as to the proper construction of the act of March 2, 1889, is sound and in entire harmony with the views of this court. In this proceeding the court has been informed as to the usages and customs of the different tribes of the Sioux Nation, and has found as a fact that the common law does not obtain among said tribes, as to determining the race to which the children of a white man, married to an Indian woman, belong; but that, according to the usages and customs of said tribes, the children of a white man married to an Indian woman take the race or nationality of the mother. Presumptively a person apparently of mixed blood, residing upon a reservation, drawing rations, and upon the rolls as an Indian, is in fact an Indian. Famous Smith v. United States, 151 U. S. 50, 14 Sup. Ct. 234, 38 L. Ed. 67. In Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, it was said by the Supreme Court:

"In construing any treaty between the United States and an Indian tribe * * * the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." Sloan v. United States (C. C.) 118 Fed. 283.

It is held in the case last cited that mixed bloods, who were recognized by the tribe as members thereof, and have been formally declared such by the tribe in council or the equivalent, may properly be given allotments. It is also said in the same case that, upon the question as to whether a person has been so recognized or not, the rulings of the Land Department will be followed. This rule would deprive the complainant in this case of any remedy whatever under the provisions of Act Feb. 6, 1901, c. 217, 31 Stat. 760, and therefore cannot be accepted as the true rule in all cases. The United States have never, so far as legislation is concerned, recognized the technical rule of the common law in reference to the children born

of a white father and an Indian mother. In 1897, Congress, in the Indian appropriation act of that year (Act June 7, 1897, c. 3, 30 Stat. 90), declared:

"That all children, born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe, shall have the same rights and privileges to the property of the tribe to which the mother belongs or belonged at the time of her death by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such rights."

See, also, opinion Atty. General Cushing, 7 Op. Atty. Gen. 46.

In a letter of Commissioner Morgan to the Secretary of the Interior dated April 14, 1890, relative to allotments under the act of March 2, 1889, now under consideration, the Commissioner said:

"In carrying out the provisions of the general allotment act, Indian women married to white men, or to other persons not entitled to the benfit of the act, are regarded as heads of families and entitled to allotments as such. The same rule should govern in allotting land under the Sioux act." Senate Ex. Doc. No. 59, p. 115, 53 Cong.

In Davison v. Gibson, 56 Fed. 445, 5 C. C. A. 545, the Circuit Court of Appeals of this circuit said:

"It is common knowledge, of which the court should take judicial knowledge, that the domestic relations of the Indians of this country have never been regulated by the common law of England, and that that law is not adapted to the habits, customs, and manners of the Indians."

The court has considered the cases cited by counsel for defendants wherein, upon certain facts, persons were held not to be Indians; but these cases either seek to invoke what they say was the common law, or are in criminal proceedings. These cases, so far as they seek to invoke the common law to the Indians, are not followed, for reasons herein stated, and, so far as they seek to construe criminal statutes, are inapplicable as there is a wide distinction to be made between the construction of a criminal statute and a contract between a tribe of Indians and the United States.

Without going farther, the court is of the opinion that, under the facts found in this case and the evidence in the record, the complainant is entitled to a decree canceling the trust patent issued to Black Tomahawk, and decreeing that complainant is entitled to have the land in controversy allotted to her by the United States, under the provisions of the act of Congress of March 2, 1889.