SULLY et al. v. UNITED STATES et al.

(Circuit Court, D. South Dakota, S. D. February 28, 1912.)

No. 534.

1. INDIANS (§ 13*)—ALLOTMENT—ACTIONS—JURISDICTION.

Act Feb. 6, 1901, c. 217, 31 Stat. 760, authorizing all persons in whole or in part of Indian blood entitled to an allotment of land to prosecute any action in the proper Circuit Court of the United States to determine their rights to any allotment under any law or treaty, gives relief to persons in part of Indian blood who claim to be entitled to an allotment and who claim to have been denied therefrom unlawfully under any law or treaty.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*

Citizenship as affecting jurisdiction of federal courts, see note to Mason v. Dullagham, 27 C. C. A. 298.]

2. INDIANS (§ 13*)—ALLOTMENT—ACTIONS—JURISDICTION.

Where the failure of persons of Indian blood to be enrolled and allotted land under any law or treaty was due solely to the misconduct of an officer of the United States, equity had jurisdiction to grant relief to such persons under Act Feb. 6, 1901, c. 217, 31 Stat. 760, authorizing actions to determine the right to allotment of land under any law or treaty.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

3. INDIANS (§ 13*)—ALLOTMENT—PERSONS ENTITLED TO.

The test of the right of persons of Indian blood to be enrolled and share in land is fixed by Indian Treaty April 29, 1868, 15 Stat. 635, setting apart territory to Indians of the Sioux Nation and such other friendly tribes or individual Indians as the Nation may be willing to admit, depends on the existence of membership in the Nation, in the absence of any statute intrusting to any governmental official the power to enter names on the rolls of the Nation or to strike names from the rolls.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

4. INDIANS (§ 13*)—ALLOTMENT—PERSONS ENTITLED TO—"RECEIVING RATIONS AND ANNUITIES."

An Indian woman of the half-blood was born on the Sioux reservation and exercised what she believed to be her right to go on the reservation because of her Indian Yankton Ai blood, and she constantly associated and affiliated with the Sioux tribes. She married a white man; but, according to the custom of the tribes of the Sioux Nation, she remained the head of the family, and the right to tribal property was determined by her nationality. Her children were born into such Indian tribes, and she and her descendants were actual residents on the reservation and associated and affiliated with the tribes of the Nation prior to Act March 2, 1889, c. 405, 25 Stat. 888, setting apart a permanent reservation for the Indians "receiving rations and annuities." Held, that she and her descendants were within the Treaty of April 29, 1868, 15 Stat. 635, setting apart land for Indians of the several tribes of the Sioux Nation and such other friendly tribes or individual Indians as from

time to time they adopted with the consent of the United States, the words "receiving rations and annuities" in the act of 1889 not being intended to be interpreted in the light of future regulations requiring rolls to be made up and approved by an officer of the United States in the Indian Department, and she and her descendants were entitled to be considered Indians of the Rosebud reservation within Act March 3, 1899, c. 450, 30 Stat. 1362.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, vol. 4, pp. 3544, 3545; vol. 8, p. 7686.]

5. INDIANS (§ 13*)—ALLOTMENT—PERSONS ENTITLED TO.

An Indian woman of the half-blood and her children of a marriage with a white man and grandchildren of a marriage with a white man are within the Indian Treaty of April 29, 1868, 15 Stat. 635, setting apart land for Indians, and Act March 2, 1889, c. 405, 25 Stat. 888, providing for the allotment of land to Indians and subsequent amendments.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 13; Dec. Dig. § 13.*]

In Equity. Suit by Mary Sully and others against the United States of America and another. Judgment for complainants.

George A. Jeffers and Joe Kirby, for complainants.
Edward E. Wagner, U. S. Dist. Atty., for defendants.

ELLIOTT, District Judge. The above-entitled action has been submitted upon the pleadings and proofs, and after hearing counsel for the respective parties, the court makes and files the following:

## Findings of Fact.

(1) That prior to 1840, Scares at his Shadow, a full-blooded Yankton Indian, and Wistu, a full-blooded Yankton Ai or Crow Creek Indian woman, intermarried upon what was then the Great Sioux Indian reservation, and as the issue of said marriage an Indian girl, who was named Goodline, was born.

(2) That thereafter, when Goodline was about 14 years of age, in 1850 or 1851, Goodline, this Indian girl, whose father was a Yankton, and her mother a Crow Creek Indian, married a Frenchman named Goulette, on the Great Sioux reservation near old Ft. Pierre, and was a little later deserted by Goulette, and as the issue of said marriage an Indian girl was born, near the old stockade at Ft. Pierre, within the Great Sioux reservation, in the now state of South Dakota, in the year 1852, named Mary Goulette (now Mary Sully), who is the above-named complainant; the rest of the complainants being her descendants, as will appear from further findings.

(3) That in 1868 said Mary Goulette (now Mary Sully) married Henry Brindell, a white man, and an employé at the Whetstone Issue Station on the Great Sioux reservation, and they continued to reside there until 1869, when the said Henry Brindell died, and was buried near the old Whetstone Issue Station on said reservation, and there was born to them, the issue of said marriage, a daughter named Mary Brindell (now the complainant Mary McGhee hereinafter referred to);

Mary Brindell being born at her father's place east of the Missouri river just across from the Whetstone agency, soon after her father's death.

(4) That in 1889 said Mary Brindell was living on the Rosebud reservation on the west side of the Missouri river on one of the islands in the Missouri river, same being a part of the reservation, and was married to Pat Gaughen, said marriage taking place on the east side of the Missouri river in Charles Mix county, where she continued to reside with her husband for a period of about six months, when she and her said husband returned to the west side of the river on what was known as Pocahontas Island, where they had resided before being married, she with her mother, and he as an employé of one of her relatives.

(5) That there was born to them, the issue of this marriage, five children, complainants herein, Emmet Gaughen, born in 1893; Ollie Gaughen, born in 1894; Mollie Gaughen, born in 1896; Julia Gaughen, born in 1899; Emma Gaughen, born in 1900—all of whom were born upon the said Rosebud reservation, and said Pat Gaughen died and was buried on the Rosebud reservation in 1900.

(6) That after the death of said Pat Gaughen his wife, Mary Brindell, married a white man, Nels McGhee, in 1902. That they continued to live on the Rosebud reservation, and in 1903 there was born, the issue of said marriage, a daughter named Grace McGhee, one of the complainants herein.

(7) That subsequent to the death of Henry Brindell in 1869, and about 1871, the said Mary Brindell (now Mary Sully) married John Kinkaid, a white man, on the east side of the Missouri river in Charles Mix county, at which place there was born to them, the issue of said marriage, Amy Kinkaid (now La Roche), who is now enrolled and allotted on the Lower Brule agency, and who is not a party to this action; the complainant William Kinkaid, born in 1874; and Estelle Kinkaid (now the complainant Estelle Blackbird), born in 1875. And said John Kinkaid died in 1877.

(8) That on January 3, 1892, said Estelle Kinkaid, daughter last above named, married Joe Blackbird, a white man, on the Rosebud reservation, where they have since continued to reside, and there was born to them upon said Rosebud reservation, the issue of said marriage, the complainants Susie Blackbird, born in 1893; Louisa Blackbird, born in 1895; Annie Blackbird, born in 1896; and George Blackbird, born in 1900.

(9) That subsequent to the death of John Kinkaid above named, his widow, Mary Goulette Brindell Kinkaid, married John Sully, on the east side of the Missouri river in Charles Mix county. That as the issue of said marriage between said Mary and John Sully there was born to them on Pocahontas Island, within the Rosebud reservation, the following named complainants in this action: Louisa Sully (now Louisa Waugh), born in 1882; Eva Sully, born in 1884; Millie Sully, born in 1885; John Sully, born in 1887; Frank Sully, born in 1888; George Sully, born in 1890; Samuel Sully, born in 1893; and Claude Sully, born in 1897. And said John Sully died and was buried on the Rosebud reservation in 1904.

(10) That in 1900 Louisa Sully, the oldest child above named, was married to a white man named Frank Waugh, at and upon the Rosebud reservation, and there was born to them, on the said reservation, the issue of said marriage, complainants herein as follows: John Waugh, born in 1901; May Waugh, born in 1903; Reanor Waugh, born in 1905, in Canada, during a temporary absence from the reservation.

(11) That continuously since 1883 to 1886 all of the complainants have resided on the Great Sioux reservation in South Dakota, until it was segregated by the Act of Congress of March 2, 1889, into the Rosebud and Lower Brule reservations, and all of said complainants then continued to live on what is now the Rosebud reservation, except such of those as were born upon the reservation during that time, and they have lived all their lives there, except as herein stated.

(12) That in the year 1892 the complainants Mary Sully and all of her children by the said John Sully, then born, together with William Kinkaid and Estelle Blackbird, were duly enrolled by the authorities in charge of the records of the Lower Brule reservation, and their names were continued upon said rolls until 1897, when at some time during that year, one more child, the son of Mary Sully, Claude Sully, was added to the said roll at said agency.

(13) That thereafter the names of the complainants mentioned in the last paragraph were, without notice to or consent of, any of said complainants, dropped from said roll of the Lower Brule agency, some time after the year 1897, and have not since appeared thereon.

(14) That at all times while said complainants were enrolled at the Lower Brule reservation they received and shared in the annuities and per capita payments which were made under the provisions of the act of March 2, 1889, the same as all other Indians on said reservation.

(15) That while said complainants were so enrolled on the Lower Brule agency they were each allotted Indian land thereon by the special allotting agent of the government for that purpose, but subsequently all of said land was taken from them and allotted to other parties, all of which was done without their consent.

(16) That in 1896 the said complainants who were enrolled at the Lower Brule reservation or agency, together with a large number of other Indians, moved, with their belongings, south of the White river onto the Rosebud reservation, but which the said Indians believed to be their territory, which removal resulted in an act of Congress, and a treaty between the Lower Brules and Rosebuds, bearing dates, respectively, March 1, 1898, and March 10, 1898, and approved by an act of Congress dated March 3, 1899, at which place on said Rosebud reservation complainants have ever since continued to so reside.

(17) That at the date said treaty was negotiated between James McLaughlin, in behalf of the government, and the Lower Brule Sioux, which resulted in the act of Congress last above mentioned, one of the chief spokesmen of the council held for the purpose of procuring such treaty, in the presence of the other Indians, requested of the said McLaughlin that the names of said complainants be included among those who were in the future to reside on the Rosebud reservation, and at

said time said Lower Brules, by their chiefs and spokesmen, recognized said complainants as members of their band.

(18) That prior to the time complainants were placed upon the rolls, a council was had upon the reservation near where Oacoma now is, and it was the sense of that meeting that complainants should become members of the Lower Brule tribe.

(19) That later, in 1908, a council was held at Rosebud, and those present favored receiving complainants into the Rosebud band.

(20) That the court finds that as a matter of fact, prior to the treaty of 1889, if a member of one tribe wanted to become a member of another, or an Indian wanted to go from one band to another, they made the transfer by simply going there and joining the band. As a matter of fact, they were always accepted. The record also shows that many Yankton Indians associated with the Brules and settled there, have been allotted on the Rosebud, and are known as members of that band, and that it was all done by simply going from the one reservation to the other and affiliating with them. It appears upon the record that Indians desiring to go from one band to another were invariably accepted by the chiefs or subchief, and that this migratory custom continued until the treaty of 1889, when the separate reservations were set apart for the different bands.

(21) I further find from the record that the custom of the Indians, where they are part of one blood and part of another, as to which one they will choose, is varied. It was optional with the Indians to choose for themselves where they would remain, whether with the tribe of the father's blood, or with the band of their mother's blood, and as a matter of inheritance, under the Indian custom, they took the blood of their mother. However, it was a matter of choice with them.

(22) Scares at his Shadow was a full-blooded Yankton Indian; Wistu, his wife, a full-blooded Yankton Ai; Goodline, their daughter, was a full-blood, born upon the Great Sioux reservation, her father a Yankton, her mother a Yankton Ai, or Crow Creek. Complainant Mary Sully, a daughter of Goodline and a white man, is a half-breed, born upon the Great Sioux reservation. That she does not speak the English language, understands a little, but speaks only the Indian language.

(23) That Mary McGhee, complainant, is a quarter-blood, the daughter of said complainant Mary Sully; William Kinkaid, Estelle Blackbird, Louisa Waugh, Eva Sully, Millie Sully, John Sully, Frank Sully, George Sully, Samuel Sully, and Claude Sully are all children of the complainant Mary Sully, and are therefore one-fourth Indian blood, and were all born upon and have always lived upon the Rosebud Indian reservation, except the complainants Kinkaids, who were taken upon the Rosebud reservation after the death of their father, to wit, in 1885.

(24) That complainants Emmet Gaughen, Ollie Gaughen, Mollie Gaughen, Julia Gaughen, Emma Gaughen, Grace McGhee, Susie Blackbird, Louisa Blackbird, Annie Blackbird, George Blackbird, John Waugh, May Waugh, and Reanor Waugh are all grandchildren of complainant Mary Sully and are one-eighth Indian blood, and were

born and have always lived upon the Rosebud Indian reservation, except Reanor, who, during a temporary absence, was born in Canada; his mother returning with him soon after his birth.

(25) That since 1885 those of complainants who were born before that time, and all the complainants born since that time were born upon said reservation, have lived upon said reservation and associated and affiliated with the Indians on what now constitutes the Rosebud and Lower Brule reservations, and during all of said time until the same was opened for settlement there were no white associates for these people living on that side of the Missouri river upon said reservation, except the white men who had Indian wives and were raising Indian families.

(26) That the complainants, so far as they have received any education at all, have received the same at the Indian schools, and the names of the complainants that were taken to the government school at Chamberlain were, by the superintendent of said school, forwarded to the Indian agent at Lower Brule and Rosebud from time to time, and no objection was ever made to the education of these children in said schools, and George Sully was at one time arrested on the Rosebud reservation, by the Indian police, and taken into custody, and sent back to the Indian school.

(27) That said Scares at his Shadow and Wistu, at the time of the marriage of Goodline to Goulette in 1850 or 1851, were hunting on the Great Sioux reservation west of old Ft. Pierre, and they gave Goodline to Narcissus Drapeau, a French trader, and they were married and lived together under the Indian custom, as man and wife, from and after 1854.

(28) The mother and father of Goodline thereafter returned to the Yankton Indian reservation, and six or eight years after the marriage of Goodline, who was the mother of the complainant Mrs. Sully, Goodline went down from the Great Sioux reservation west of Ft. Pierre, to the Yankton Indian agency, and a little later her husband, Drapeau, followed her there and lived for about six months at the Yankton agency with her mother and father; he being employed at the agency.

(29) That six months or a year after Drapeau came down, he, with his wife, Goodline, and family, including Mary (now Mary Sully), moved up near the mouth of Platte creek on the east side of the Missouri river, and also established a residence on Cedar Island, and afterwards on Pocahontas Island, both of which were within the Great Sioux reservation, and maintained a residence from that time on at both places, living a part of the time in the home he had provided on the island and a part of the time on what he called his homestead on the east side of the river.

(30) That said complainant Mary Sully and none of her descendants were ever upon the rolls at the Yankton Indian agency, and none of them participated in or profited by any payments that were made to the Yankton tribe of Indians, or allotments that were given them under and pursuant to treaties with the government of the United States.

(31) That Scares at his Shadow and Wistu were members of the Medicine Cow band of the Yankton tribe of Indians, after she married

him, and from the establishment of said agency, under the treaty of 1868, continued to live upon said agency, affiliate with the Yankton Indians, and drew rations and received allotments as members of that tribe.

(32) That the record does not show, however, that Goodline received any rations later than 1868, and she maintained a home, with her husband, Drapeau, upon Cedar Island, and upon his homestead on the east side of the river, for a number of years, until about the year 1890, when she removed to the Rosebud reservation, where she resided until she died and was buried there in 1904.

(33) That in 1868, after the treaty between the United States and the Great Sioux tribes of Indians was made at Ft. Laramie, Wyo., March 2, 1868, the Indian agency for said Indians was located at the mouth of Whetstone creek, on the west side of the Missouri river, within a few miles of the place where said Drapeau squatted at the mouth of Platte creek, and said agency, known and designated as the Whetstone agency, remained at said point for about three years, and during its location there the said Goodline and the members of her family and the complainants herein lived near the said agency, upon the Great Sioux reservation, were enrolled as members of the Brule Sioux band, and Goodline and husband returned to their former place of residence at Platte creek on the east side of the river, and at Cedar Island and Pocahontas Island on the reservation, when Whetstone agency was moved west in 1872, and they continued to maintain both residences, staying a part of the time at one place and part at the other, until their removal as above found. And Mary Sully and the other complainants came down, with the other Indians, to the Rosebud reservation.

(34) That on July 8, 1873, Narcissus Drapeau, husband of Goodline, made application under the homestead laws of the United States to enter the W. ½ of the S. E. ¼ and the S. E. ¼ of the S. E. ¼ of section 28—98—69, Charles Mix county, S. D., under the act of March 21, 1864, entitled "An act to secure homesteads to actual settlers on public lands." On January 26, 1883, he made final proof in support of this entry and received final certificate, and a patent was issued to him therefor June 30, 1884. He also made pre-emption entry under the laws of the United States on the N. E. ¼ of the S. E. ¼ of section 21, and the N. ½ of the S. W. ¼ and the S. W. ¼ of the S. W. ¼ of section 22—98—69 in Charles Mix county, S. D., on which he settled December 31, 1883, and made final proof September 3, 1886, and on September 14, 1886, received certificate of proof, and proof under such entry was duly approved July 30, 1889, and on September 14, 1889, a patent therefor was issued to him.

(35) That John Kinkaid, deceased husband of the complainant Mary Sully, on November 1, 1873, entered the N. W. ¼ of the N. W. ¼ and the E. ½ of the N. W. ¼, and lot 1 of section 27—98—69, under the homestead laws of the United States, and on January 6, 1880, the complainant Mary Sully, under the name of Louisa Kinkaid, widow of John Kinkaid, deceased, made final proof in support of said homestead entry, and received final certificate therefor. Patent issued to

said Louisa Kinkaid, widow of John Kinkaid, November 20, 1880, and on the 19th of September, 1881, the complainant Mary Sully, under the name of Louisa Kinkaid, widow of John Kinkaid, sold and conveyed said land to D. F. Reynolds, and John Sully, her late husband, was a witness to the execution of said deed.

(36) That on April 28, 1882, John Sully, deceased husband of the complainant Mary Sully, entered, under the homestead laws of the United States, the N. E. ¼ of the N. W. ¼, and the N. W. ¼ of the N. E. ¼ of section 35—98—69, and on January 28, 1884, he made final commutation proof in support of such entry, and on the 7th day of February, 1884, received receiver's final receipt therefor.

(37) That said John Sully, on or about June 5, 1882, made timber culture entry upon a quarter section of land in Charles Mix county, S. D., which he thereafter, on, to wit, July 11, 1887, relinquished back to the United States.

(38) That said Sully and Kinkaid and Drapeau continued to maintain their home on Cedar Island and Pocahontas Island on the Great Sioux reservation after they had made filing upon government land, under the homestead laws above stated, and never in fact abandoned the settlement they originally made upon said islands, spending a portion of the time there and a portion out on the government land.

(39) That neither of the complainants herein have ever been adopted into the Brule Sioux, commonly known as the Lower Brule Indians, or the Rosebud band of Indians by three-fourths vote of the adult members thereof, nor with the consent or approval of the United States.

(40) That the United States, through its officers and agents, did not approve either of the adoptions heretofore referred to herein.

(41) That complainant Mary Sully and family, complainants herein, were placed upon the roll at Lower Brule agency by Luke Hayes, a subagent in charge of the Lower Brule agency, and that they were by him entered upon the census roll at said agency, and drew rations and annuities there during the years above stated, and then their names were stricken from said roll by order of the Commissioner of Indian Affairs, and were never thereafter restored.

(42) That in 1895 complainant Mary Sully, her mother (under the name of Mary Drapeau), and her daughters, and the plaintiff Mary Gaughen, and other complainants, applied to the Commissioner of Indian Affairs and the Secretary of the Interior for enrollment at the Rosebud agency and membership among the Rosebud Indians, and were denied on the ground that whatever rights they had as Indians would be as members of the Yankton Sioux tribe and they had no rights as members of any of the tribes of the Brule Sioux Nation.

(43) That in 1899 the applications of complainant Mary Sully and other complainants herein were denied by the Secretary of the Interior upon the same ground.

(44) That about 1897 the names of said complainants were dropped from the rolls at the Lower Brule agency, and they have never either of them received rations or annuities at said agency except as above stated, and none of the complainants have ever at any time been

enrolled at the Rosebud Indian agency or drew or received rations or annuities at said Rosebud agency or elsewhere, as members of the Rosebud band of Indians.

(45) That the complainants have repeatedly sought from the proper government Indian agents, officers of the Indian Department, and allotting agents of the United States, at the Rosebud reservation, enrollment and allotments of Indian land, under the acts of Congress, to which they claim they are entitled, and have at all times been refused.

(46) That the lands described in the bill of complaint, and which complainants in this action seek to have allotted to them, is the land which they selected and which was denied them by the officers of the government.

(47) That complainants have been denied enrollment as members of this tribe of Indians, and denied allotments by the officers of the Indian Department of the United States, for the reason that they were not Lower Brule or Rosebud Indians, and for the reason that Scares at his Shadow and Wistu, the grandmother of the complainant Mary Sully, affiliated with and were enrolled as Yankton Indians after the establishment of the Yankton Indian reservation, under the treaty of 1868.

(48) That there is, and always has been, a custom, amounting to a law, in force among the different bands or tribes of the Sioux Nation of Indians, to the effect that a white man marrying an Indian woman, a member of said tribe, the Indian woman becomes and remains the head of the family and is the source from which all annuities, per capita payments, and rations are derived for herself and family. That by this law and custom the right to tribal property is determined by the nationality or race of the Indian mother; the children of the marriage of a white man with an Indian woman take the race or nationality of the mother so far as the right to tribal property is concerned.

(49) I further find that the children of a white father and a mother of Indian blood take the race or nationality of the mother, and the common-law rule that children take the race or nationality of the father does not obtain among the Indians as to the offspring of a marriage between a white man and an Indian woman.

(50) That the fact that an Indian child is born outside a reservation does not of itself affect the right of the child to tribal property according to the laws and customs of the Sioux Nation.

[1] This action is brought under the provisions of the Act of February 6, 1901, c. 217, 31 Stat. 760, for the purpose of having a determination of the rights of the complainants to be enrolled at the Rosebud Indian agency and to have and receive as their Indian allotments the lands mentioned and selected by or for them as described in the bill of complaint filed herein, the rights of the complainants being dependent upon the foregoing findings of fact and the provisions of the Acts of March 2, 1889, c. 405, 25 Stat. 888; March 3, 1899, c. 450, 30 Stat. 1362–1365; and March 1, 1907, c. 2285, 34 Stat. 1048.

The first statute above referred to provides, at section 1:

"That all persons who are in whole or in part of Indian blood, or descent, who are entitled to an allotment of land under any law of Congress, or who

claim to be so entitled to land under any allotment act, or any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land, to which they claim to be lawfully entitled by virtue of any act of Congress, may commence and prosecute or defend any action, suit or proceeding in relation to their rights thereto, in the proper Circuit Court of the United States; and said Circuit Courts are hereby given jurisdiction to try and determine any action, suit or proceeding arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty; and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him."

The first proposition involved within the issues presented by the pleadings is: Are all of the above-named complainants persons who are in whole or in part of Indian blood or descent? It will be noted from the above findings of fact that the court has found that Mary Sully and the rest of the complainants, her descendants, are in part of Indian blood.

It has been held that the foregoing statute was passed for the relief of persons in part of Indian blood or descent, who claim to be entitled to an allotment of land, and who claim also to have been denied or excluded from this right unlawfully, under the circumstances set forth in the bill of complaint filed herein, and as set forth in the foregoing findings of fact.

And this court may therefore properly assume jurisdiction of this controversy. Hy-yu-tse-mil-kin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039; Waldron v. United States et al. (C. C.) 143 Fed. 413.

The land which the complainants claim should have been allotted to them is all within the limits of the Rosebud Indian reservation, and the claims of the complainants are based on the contention that they are all members of the Rosebud band of the Great Sioux Nation of Indians; and are, and during all of the years since the establishment of that agency, and especially since application therefor by complainants, they have been, entitled to enrollment as members thereof.

The first statute or treaty that has any bearing upon the rights of these complainants is the treaty of April 29, 1868 (15 Stat. 635), which was a treaty between the United States and several bands of the Sioux Nation of Indians.

Article 2 provides as follows:

"The United States agrees that the following district or country, to wit (description), shall be and the same is set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no person except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article; or in such territory as may be added to this reservation for the use of said Indians. And thenceforth they will and do hereby relinquish all claims or right in and to any portion of the United States or territory except such as is embraced within the limits aforesaid, and except as hereinbefore provided."

The parties to this agreement with the United States were the following bands of the Sioux Nation of Indians, to wit: Brule, Ogallala, Minneconju, Yankton Ai, Hunk Papa, Black Feet, Cut Head, Two Kettles, Sansarcs, Sante, and Arapaho.

Under the claims set forth by the complainants, and the findings of fact herein, it is unnecessary to consider any of the foregoing named bands except the Yankton Ai and the Brule. It will be observed that the Yankton band of Indians was not a party to this treaty.

The country above described included all of the reservations of the Lower Brule Indians and the Rosebud Indians, including the location of the old Whetstone agency west of the Missouri river, but did not include the reservation theretofore set apart for the use and benefit of the Yankton Indians.

Immediately after the making of this treaty at Ft. Laramie, a large number of Indians belonging to the different bands of Sioux tribes of Indians removed to the Whetstone west of the Missouri river, and an agency was established there. As appears from the record herein, in those days the agency followed the Indians, rather than the Indians staying in the vicinity of an agency.

At this time the complainants moved near the Whetstone agency on this Great Sioux reservation, were enrolled, and rations were issued to them, recognizing them as Indians entitled to the benefits of members of the Great Sioux tribe of Indians, until 1872, when the agency was removed from Whetstone west, when the claimant Mary Sully, and the other complainants then living, remained there and went with other Indians and half-breeds to the former island home which was within said Great Sioux reservation, and thereafter, in about 1886, moved over onto what was known as Sully Flats on the Rosebud reservation, where they have ever since resided.

The next act of Congress to be considered is that of March 2, 1889 (chapter 405, 25 Stat. 888), section 2 of which is as follows:

"That the following tract of land, being a part of said Great reservation of the Sioux Nation, in the territory of Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and annuities at the Rosebud agency in said territory of Dakota. * * *"

Section 5:

"That the following tract of land, being a part of the Great reservation of the Sioux Nation, in the territory of Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and annuities at the Lower Brule agency in said territory of Dakota. * * *"

Section 8:

"That the President is hereby authorized and required whenever in his opinion any reservation of such Indians or any part thereof, is advantageous for agricultural or grazing purpose, and the progress in civilization of the Indians receiving rations on either or any of said reservations shall be such as to encourage the belief that an allotment in severalty to such Indians, or any of them, would be for the best interest of said Indians, to cause said reservation, or so much thereof as is necessary to be surveyed or resurveyed, and to allot the lands in said reservation in severalty to the Indians located thereon as aforesaid, in quantities. * * *"

Then follows a provision with reference to allotment of a greater amount in case the land is grazing land.

Section 9 provides:

"That all allotments set apart under the provisions of this act shall be selected by the Indians, heads of families selecting for their minor children, * * * in such manner as to embrace the improvements of the Indians making the selection. * * * "

The next statute to be considered is that of March 3, 1899 (30 Stat. 1362–1365), wherein it is provided:

"It is hereby agreed on the part of the United States that allotments in severalty shall be made to all children born prior to the date of the ratification of this agreement, then living, in manner and quantity as provided in section 8 of said act of March 2, 1889."

By the act of March 1, A. D. 1907 (34 Stat. 1048), it is provided:

" * * * That hereafter the President shall cause allotments to be made under the provisions of said act of March 2, 1889, to any living children of Indians, affected thereby, who have not heretofore been allotted."

By the act of Congress March 2, 1889, the lands including those claimed by these claimants as their allotments, the same being a part of the Great reservation of the Sioux Nation, were set apart for a permanent reservation "for the Indians receiving rations and annuities at the Rosebud agency in said territory of Dakota."

These complainants have been denied their right to an allotment under the provisions of this statute, because they were not enrolled and receiving rations and annuities at the Rosebud agency.

If, under the findings herein, as a matter of law, they were not Indians entitled to receive rations and annuities, no injustice has been done them, and they have no rights that a court of equity can enforce. If, however, under the findings heretofore made herein, the complainant Mary Sully and her descendants were entitled to receive rations and annuities at either the Rosebud agency or Lower Brule agency, then she and her descendants are within and should have the benefit of this provision of the act of Congress of 1889 providing for the allotment of lands in severalty.

[2] If the complainants' failure to be enrolled and allotted has been due to the misconduct or neglect of an officer of the United States, and if the failure of such officer to enroll complainants was the sole cause of their failure to receive the allotments demanded in the bill of complaint, equity will relieve them. Lytle et al. v. Arkansas et al., 9 How. 328, 13 L. Ed. 153.

[3] The test of the right of these complainants to be enrolled and share in these lands was existing membership in the tribe, and included "such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them."

I do not understand that at the time of the enrollment of complainants at the Whetstone agency, or at the Lower Brule agency, at the time of the passage of the act of 1889, there was any provision in the agreement or any provision of the United States law intrusting the power to enter names upon the rolls, or to strike names from the rolls, to the Indian Department or any officer of the government, and

therefore the condition does not obtain here that obtained in Ligon et al. v. Johnson et al., 164 Fed. 670, 90 C. C. A. 486.

It is there said, by Circuit Judge Hook, that:

"The experiences of many years in the new domain west of the Mississippi river demonstrated the incapacity of the Indians for just and equitable government, and gross abuse of power marked the administration of their affairs. It was thereafter finally determined to put an end to national or tribal titles and to cause at least part of their lands to be allotted and divided in severalty among the Indians entitled thereto. A commission, generally called the 'Dawes Commission,' was created by act of March 3, 1893, * * * and by a series of subsequent acts, and by agreements with the tribes it was intrusted with the task under the direction of the Secretary of the Interior." Page 671 of 164 Fed., page 487 of 90 C. C. A.

"Originally the test of the right of individual Indians to share in tribal lands, like the Chippewa reservations in Minnesota, was existing membership in the tribe, and this was true of all tribal property." Oakes v. U. S., 172 Fed. 307, 97 C. C. A. 139.

It is my judgment that the rights of the complainants must be measured by this rule, as there was no treaty, agreement, or statute of the United States imposing upon any officer of the United States the power to make a complete roll, and declaring that the acts of said officer should be conclusive upon the questions involved. I do not mean to be understood as saying that Congress had not that power—simply that it had not been exercised when the alleged rights of these complainants attached.

"For many years the power to determine who were and who were not citizens of these tribes was left exclusively to the tribal authorities; names were added to and stricken from the rolls at will, and when Congress intrusted the power to administrative officers of the government, it did not change that which was of a purely political character into a subject-matter for the intervention of the court." West v. Hitchcock, 205 U. S. 80, 27 Sup. Ct. 423, 51 L. Ed. 718; Ligon et al. v. Johnson et al., at page 673 of 164 Fed., 90 C. C. A. 486.

Congress did, however, provide for the intervention of the courts where persons "in whole or in part of Indian blood, entitled to an allotment of land under any law of Congress or who claimed to be so entitled to land under any allotment act, or any grant made by Congress, or who claimed to have been unlawfully denied or excluded from any allotment or parcel of land to which they claimed to be lawfully entitled by virtue of any act of Congress, * * *" were given the right to commence an action in this court, etc. Act of February 6, 1901, c. 217, 31 Stat. 760.

[4] It is within the findings of fact herein that prior to 1889 there was a custom, amounting to a law, in force among the different bands or tribes of the Sioux Nation of Indians, to the effect that a white man marrying an Indian woman, a member of said tribe, the Indian woman becomes and remains the head of the family and is the source from which all annuities, per capita payments, and rations are derived for herself and family. That by this law and custom the right to tribal property is determined by the nationality or race of the Indian mother. And the children of the marriage take the race or nationality of the mother so far as the right to tribal property is concerned.

There is no dispute in the record: That the mother of complainant

Mary Sully was an Indian woman, Goodline, whose father, Scares at his Shadow, was a Yankton Indian, and whose mother, Wistu, was a Yankton Ai or Crow Creek Indian. That after Wistu married Scares at his Shadow, and after the birth of complainant Mary Sully, they became members of the Yankton band of Indians, were enrolled upon that agency, and received the benefits of treaties with said tribe. The complainant· Mary Sully was born upon the Great Sioux reservation at the old stockade west of Ft. Pierre, in about 1852, her father being a Frenchman. That her mother, Goodline, after being deserted by the father of Mary Sully, and when Mary was about two years old, married Narcissus Drapeau, a Frenchman; the marriage being according to Indian customs and taking place at the old stockade upon the Great Sioux reservation west of Ft. Pierre, in the then territory of Dakota.

It is undisputed that they continued to live there upon that Great Sioux reservation until six or eight years later, when she went down to the Yankton agency, with her brother, and soon thereafter her husband, Drapeau, followed her, and he worked for six months or a year at the Yankton agency, during which time they lived with Goodline's mother and father, and then went up to the mouth of Platte creek on the said Yankton Indian reservation, and established a home there, and also established a home over on Cedar Island in the Missouri river, which was within the Great Sioux reservation, and the complainant Mary Sully was taken to this home at Platte creek and the one upon Cedar Island, with them. It further appears that this complainant and her mother, soon thereafter, severed all relations with the Yankton Indians, and its does not appear that the complainant or any of her descendants were ever upon the rolls of the Yankton Indians.

The record discloses that she married, soon thereafter, a white man named Henry Brindell, in about 1867, when she was about 15 years old, which marriage took place east of the Missouri river, and that immediately after their marriage they took up their residence at Pocahontas Island on the Great Sioux reservation, and in about a year they moved to the Whetstone agency, which had been moved from Ft. Laramie down on the west side of the Missouri river, near where complainants had theretofore resided; and she was placed upon the rolls and was issued rations and in all respects treated as a member of the Great Sioux Nation, entitled to the benefits of the treaty of 1868.

Was Mary Brindell (now Mary Sully, complainant) rightfully on the rolls at the Whetstone agency, as a Sioux Indian, with the blood of one of the bands named in the treaty of 1868, entitled to the benefits of the treaty of 1868?

The Yankton Ai was one of the bands with which this treaty was made. The Indian blood of Mary Sully was from her mother, who was half Yankton Ai and half Yankton. The record discloses that she had never, since a child, had any affiliation or association with the Yankton Indians; that she had exercised what she believed to be her right to go onto the Great Sioux reservation, because of her Indian Yankton Ai blood; and that she consistently associated and affiliated with the Great Sioux Indian tribe from the date of and prior to her marriage when she was 15 years of age, and has so continued up to the present time.

The court has found from the record herein, as a finding of fact, that prior to the treaty of 1889 a member of one tribe of the Great Sioux Indians, who wanted to become a member of another, or an Indian who wanted to go from one band to another, made the transfer by simply going there and joining the band. As a matter of fact they were always accepted. It is found further that, as a matter of fact, this record shows that many Yankton Indians, associated with the Brules and settled there, have been allotted on the Rosebud and are known as members of that band, and that it was all done by simply going from one reservation to the other and affiliating with them, and that this migratory custom continued until the treaty of 1889, when the separate reservations were set apart for the different bands.

Mary Sully had this Yankton Ai blood. Under this custom she had a right to elect to live with her people of that blood. She did so elect. Her children, with one or two exceptions, the complainants herein, were born into this Indian tribe. Mary Sully herself is an Indian of the half-blood, does not speak any English, understands but little. Her children, the complainants herein, have been educated in the government Indian schools, pursuant to the provisions of the treaty of 1868, and subsequent acts of Congress.

Under these conditions, it is my judgment that the complainant Mary Sully and her descendants named as complainants herein are and were within the provisions of article 2 of the treaty of April 29, 1868, above set forth, in that she was entitled to the undisturbed use and occupation of the home selected by her upon said Great Sioux reservation, under the provision which provides:

"That the following district or country, to wit (description, including the place of her home), shall be and the same is set apart for the absolute and undisturbed use and occupation *of the Indians herein named, and for such other friendly tribes or individual Indians* as from time to time they may be willing, with the consent of the United States, to admit amongst them."

And in that connection I call attention to a further provision of this same article 2 of the treaty of 1868 as follows:

"And the United States now solemnly agrees that no person except those herein designated and authorized so to do, and except such officers, agents and employés of the government as may be authorized to enter upon this Indian reservation in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article."

It is undisputed that the complainant and such of her children as were then born had entered upon this reservation and did reside in that territory, and their right to be there was recognized, in that they were upon the rolls and drew rations as other members of the Great Sioux tribe of Indians, during the time that the agency was maintained at Whetstone, which was from 1868 to 1872. The government therefore recognized the right of this complainant and her descendants to be upon that reservation, and to permanently and continuously reside there, by failing to remove them. They recognized the rights of Mary Sully and her descendants, under the provisions of this treaty, by taking the children as they became of school age, and maintaining them

and supporting them in the government schools, pursuant to the provisions of said treaty of 1868.

The act of March 2, 1889, by section 5, sets off a tract of land, including the land described in the bill of complaint filed herein, "for a permanent reservation for the Indians receiving rations and annuities at the Lower Brule agency in said territory of Dakota."

Up to the time of the removal of the Whetstone agency west in 1872, Mary Sully, the complainant, and her descendants, complainants, who had then been born, were associated and affiliated with the Lower Brule Indians, that being the tribe or band occupying that particular locality, and they continued to affiliate with the Lower Brules and were placed upon the rolls, as the record shows, at Lower Brule agency, and drew rations and received annual payments during the years just preceding some time during the year 1897. The record further discloses that when the Whetstone agency was moved west, complainants moved back to the place of their former residence at the island, and spent some time on the east side of the river, and finally, at a time variously stated from 1883 to 1886, moved out onto what are known as Sully's Flats.

It further appears that at the time the Whetstone agency was removed, a number of the Indians belonging to the Lower Brule agency, full-bloods and mixed-bloods, refused to go west, when the agency was removed, and insisted upon staying south of the White river, which was over the line onto what was then known as the Rosebud reservation. This action of the complainant Mary Sully, with her family and other full-blood and mixed-blood Brule Indians, resulted in the act of March 3, 1899 (30 Stat. 1362, c. 450), which is as follows:

"Article 1. The said Indians belonging on the Lower Brule reservation hereby consent and agree that those of their tribe now south of the White river on the Rosebud reservation, may remain thereon; that they may take with them and have converted to the permanent fund of the Indians belonging upon the Rosebud reservation, their proportionate or pro rata share of the funds now in the treasury of the United States, to the credit of the Indians belonging upon the Lower Brule reservation, and that the Lower Brule Indians who have so removed may become and are hereafter to be considered Indians of the Rosebud reservation."

The record clearly shows that the complainant Mary Sully, and such of the complainants as were born prior to that time, resided upon this reservation, and associated and affiliated with these Indians in 1868 or 1869, and that they removed out onto the Sully Flats south of the White river on what is now the Rosebud reservation, from 1883 to 1886, and have ever since lived there with these Indians.

This record discloses: That Mary Sully is of part Yankton Ai Indian blood. That long prior to 1889, to wit, in 1869, she elected to associate and affiliate with the Great Sioux tribe of Indians, and especially with the Lower Brule band of Sioux Indians, as under the laws and customs of the Indians she had a perfect right to do, because of the fact that half of her Indian blood was Yankton Ai which was one of the bands treated with by the treaty of 1868, and subsequent treaties hereinbefore referred to. She and other complainants were actual residents of the Great Sioux reservation, and associated and affiliated with

these Indians long prior to the treaty, and act of Congress of 1889. All of the complainants then lived upon that portion of the reservation south of the White river where they went in 1872, upon the removal of the Whetstone agency west into Nebraska.

It is my judgment: That when the United States entered into these treaties, and when Congress passed the act of 1889, it was not the purpose or intent to take away any right that any person of Indian blood then had, by virtue of the laws and customs that had obtained among the Indians prior to that time, with reference to the particular band or tribe to which they claimed membership. That the words "receiving rations and annuities" were not intended to be interpreted in the light of future regulations requiring rolls to be made up and those rolls to be approved by an officer of the United States in the Indian Department. That the public officials, who, under the rules and regulations of the Department, made rolls of the Indians, acted purely in a ministerial capacity, and as to these complainants who resided upon this reservation, associated, and affiliated with these Indians prior to the act of 1889, when they were placed upon the rolls at the Whetstone agency, and when the complainants were placed upon the rolls at Lower Brule agency, the failure to recognize their right to continue their enrollment and thereafter to make allotments of land, pursuant to their selection, was a denial of a substantial right given to them under the treaties and the acts of Congress above set forth. By the election of these complainants to claim a right upon this Great Sioux reservation by and through their Yankton Ai blood, their residence, association, and affiliation with the Lower Brule band and their removal with members of that band, south of the White river, which brought forth the act of March 3, 1899, article 1 of which is above quoted, brought them within the terms of that article, and entitled them from that time forth to be considered Indians of the Rosebud reservation.

The Honorable Commissioner of Indian Affairs, on November 3, 1906, in the case of Edwin and Peter Livermont et al., held, to the effect, that Indians who were associated and affiliated with the Sioux on March 2, 1889, and their descendants, are entitled to allotment and enrollment.

I find, as a part of the record in this case, that enrollment and allotment was denied these complainants by letter of May 25, 1908, on the ground that they "did not move to the Rosebud reservation until after the passage of the act of March 2, 1889 (25 Stat. L. 888)." This is clearly an error, as there is no contention in this record before me that the removal was later than 1886, and therefore, under the finding of fact as to the time of the residence of these complainants within this Great Sioux reservation, and that it long preceded the date of the 1889 treaty, under this construction of the Indian Department, these complainants are entitled to enrollment and allotment.

[5] In conclusion, this entire record conclusively shows that these complainants are Indians of sufficient Indian blood to substantially handicap them in the struggle for existence. This handicap is one for which they are in no way responsible. I am satisfied, from this whole

195 F.—9

record, that they were and are of the class and of the persons that it was intended to include in the provisions of the treaty and statutes of 1868, of 1889, and subsequent amendments, to which I have called attention. In this view, an inexcusable wrong has been persistently adhered to in the treatment of these complainants.

It follows that I am of the opinion that complainants are entitled to judgment for the relief demanded in their bill of complaint; that they are entitled to enrollment in the Rosebud Sioux band of Indians; that they are entitled to an allotment of lands, pursuant to the provisions of the said treaties with said Indians, and the acts of Congress above referred to.

Let judgment be entered accordingly, specifying the amount selected by each complainant, the amount to which such complainant is entitled, under the provisions of the statutes of the United States, and the descriptions of land each has selected.